## Esenwein, Appellant, v. Esenwein.

Argued January 16, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*William S. Doty,* with him *Fred C. Houston, T. D. McCloskey* and *Thomas A. Thornton,* for appellant.— Appellate jurisdiction in divorce should not be extended to contradicting fact-findings of a trial judge, who personally observed the witnesses giving conflicting testimony, merely because the printed record alone, without the advantage of personal observation, might not produce the same conviction as to credibility: Naylor v. Naylor, 59 Pa. Superior Ct. 547; McMillin v. McMillin, 183 Pa. 91; King v. King, 36 Pa. Superior Ct. 33.

Testimony of a libellant, made competent by statute, and believed by the trial judge who saw and heard the witnesses, is not necessarily rendered insufficient as a matter of law merely because met by negations from a respondent, not believed by such trial judge: Krug v. Krug, 22 Pa. Superior Ct. 572.

*J. R. Sheppard,* for appellee.—On an appeal from a decree awarding a divorce, it is incumbent on the appellate court to review the testimony, and to determine whether it sustains the decree of the lower court, excepting cases where there is an issue and a jury trial: Middleton v. Middleton, 187 Pa. 612; Van Dyke v. Van Dyke, 135 Pa. 459; Humphreys v. Humphreys, 85 Pa. Superior Ct. 489; Eynon v. Eynon, 88 Pa. Superior Ct. 519.

OPINION BY MR. JUSTICE LINN, March 20, 1933:

The libel was served in June, 1920. Two years and eight months later a bill of particulars was ordered. It

was not filed until September, 1931, though it does not appear that the time for filing it was extended. Libellant might therefore have been non-prossed under the Act of May 25, 1878, P. L. 156 (reënacted, section 40, May 2, 1929, P. L. 1237), or, generally, for want of prosecution: Waring v. P. R. R., 176 Pa. 172, 35 A. 106. Neither side was diligent.

Two grounds for divorce were alleged: That respondent "(1) has by cruel and barbarous treatment endangered the libellant's life; (2) has offered such indignities to the person of the libellant as to render his condition intolerable and life burdensome."

The case was not referred to a master, nor was a jury trial asked for; it was tried by a judge, who concluded that the charge of cruel and barbarous treatment was not made out, but that libellant was entitled to a decree on the other ground. On appeal to the Superior Court, the decree was reversed in an opinion by the learned President Judge stating that "......the divorce should not be granted because.......the proofs submitted by the libellant do not come up to the required standard": 105 Pa. Superior Ct. 261.

In view of the scope of the arguments presented in support of the petitions for the allocatur, and in the three briefs filed by appellant here, we shall briefly note a few recognized principles applicable in divorce. "It is not of a single act that the law speaks in the clause under which this case falls; but *of such a course of conduct* or *continued treatment* as renders the wife's condition intolerable and her life burdensome...... Never ought divorces to be easily obtained, for marriage is the most sacred of human relations, and should never be dissolved without clear proof of imperious reasons...... Indignities provoked by the complaining party are of course no ground of divorce unless when the retaliation is excessive": Richards v. Richards, 37 Pa. 225. See, also, May v. May, 62 Pa. 206, 210; Angier v. Angier, 63 Pa. 450, 458; Sowers's App., 89 Pa. 173; Edmond's

App., 57 Pa. 232; Middleton v. Middleton, 187 Pa. 612, 615, 41 A. 291; Nacrelli v. Nacrelli, 288 Pa. 1, 7, 136 A. 228; Krug v. Krug, 22 Pa. Superior Ct. 372; Hexamer v. Hexamer, 42 Ibid. 226; Ponthus v. Ponthus, 66 Ibid. 257; Stewart v. Stewart, 88 Ibid. 1, 5; Twaddell v. Twaddell, 95 Ibid. 429, 432. "Our statute is a municipal regulation for the protection of the community as well as the wife" or husband: McDermott's App., 8 W. & S. 251, 256.

In considering whether there is that "clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce......the court must be informed what the respondent has done; not what witnesses may conclude, or what they may regard as the character of the conduct": Edmond's App., supra. General expressions "are of no value unless accompanied by the actual facts on which these assertions are based. We are entitled, in the consideration of the case, to have the particulars as to the words spoken or the things done that constituted the cause of action alleged": Ford v. Ford, 67 Pa. Superior Ct. 350, 352; Bishop v. Bishop, 30 Pa. 412, 415.

Concerning appellant's challenge of the power of the Superior Court to examine the evidence de novo for the purpose of review, it is sufficient to quote what was said by President Judge RICE in Fay v. Fay, 27 Pa. Superior Ct. 328, 334: "In Middleton v. Middleton, 187 Pa. 612 [41 A. 291], where the subject of the review of divorce cases on appeal was elaborately considered, Justice DEAN said that the Supreme Court had, even since the passage of the Act of 1815, held it incumbent on it, 'except where there has been an issue and jury trial,' to review the testimony and adjudge whether it sustained the complaint of the libellant. In McClurg's App., 66 Pa. 366, AGNEW, J., said that the only exception to the general rule, that the appeal is to be prosecuted de novo on the testimony taken in the cause, 'is where a fact has been found by a jury trial according to the act, when

this court will not retry the fact.' The exception thus plainly recognized in the two cases cited was established in Andrews v. Andrews, 5 S. & R. 374, where the precise question was raised......" The subject was recently considered, with the same result, in Nacrelli v. Nacrelli, 288 Pa. 1, 136 A. 228.

Examining the evidence in the light of these principles we are driven to the conclusion that there was no course of conduct, no continuity of treatment, constituting the cause of divorce contemplated by the statute as heretofore consistently construed.

The parties were married in November, 1899. The first charge is that in October, 1900, respondent threw a book at libellant, but missed him. At the same period, he says, she "was continually nagging me and nagging continually." Libellant's sister, called on his behalf, said that during the "forepart of their married life," she visited them "a very short time, possibly two or three days." Apparently on the relatively slight opportunity for observation so acquired, she testified that respondent "was always nagging"......"was very domineering," would "demand that he do things such as......'care for the child.' " Such general expressions, and others of the same character in the record, we lay aside, pursuant to the principle quoted above, as without evidential value.

The next specific charge is that in September, 1901, "in a fit of temper [she] broke the frame containing their marriage certificate and made life so miserable that libellant left the home for several weeks." She gives this explanation of the incident. "Q. He has also accused you of destroying the marriage certificate in a fit of anger in 1901. What about that? A. He was leaving home because I wouldn't sign the deed for the house. He wanted to go and wanted to take the marriage certificate and I didn't want him to, and we had a tussle for the certificate and he got it. Q. Did you ever get it again? Was it framed? A. Yes, sir. Q. What happened to the frame? Was the frame broken? A.

Yes, it was all torn off. Q. You were both struggling for it? A. Yes, sir." Libellant said that he did not remember the cause of the quarrel, did not "recall the cause of the tantrum." But, and we note the important fact, he did not contradict respondent's explanation of the cause of the trouble, nor question her account of the matter. If, therefore, we accept as true the statements made by each conconcerning this incident, we must apply the rule, quoted above, that "Indignities provoked by the complaining party are of course no ground of divorce unless when the retaliation is excessive." Nothing excessive is disclosed by the evidence; respondent may have had a good reason for declining to sign the deed, and if, perhaps to coerce her, "he was leaving home because [she] wouldn't sign the deed for the house," it is not surprising that she resented his taking with him the certificate of their marriage, and struggled to retain it. That incident may be laid aside, as furnishing no ground for desertion. He returned in two weeks.

Some time, not definitely specified, between 1901 and 1904, he charged, in the bill of particulars, that she hit him "on the head with a large cake of soap while he was in the bathroom." Though making that allegation under oath, his testimony is that she did not hit him, and that he did not recall the cause of their quarrel. Respondent denies the occurrence. During the same period, he testified, "I went home and the house was locked. She said she had a revolver and would shoot." Unfortunately, if true, libellant gave no other information about this charge; if true, and if he regarded it as serious, it would seem that he might have stated the circumstances more fully, particularly describing what followed and what he did about it. He also said "On one occasion in the evening she had a gun in her hand saying she would shoot me. It was discharged out of the rear window." "Q. Were you in the house? A. Yes, sir." Respondent's account is very different and more circumstantial; she states that her husband was not at home; "he was

away fishing." At night she "heard burglars and I shot out of the back window," "to scare the burglars." She denied that she ever threatened to shoot him.

In July, 1904, according to his testimony, as he "left the house and was going around the house," she threw a pot of geraniums at him without striking him. The remaining complaint of this period, is that when their son was born, libellant desired his mother to be in the house, and his wife wired her not to come, a fact, he said, communicated to him by his mother. Respondent denied both charges.

We have substantially covered the record from the time of their marriage until July, 1904, and assume that he charged the worst that happened and as fully as the facts warranted. It remains to be noted that during the period at least one of their children was born. The conduct outlined, in the light of the wife's explanations, where unrebutted by libellant, would certainly not be sufficient to make the clear case required by the decisions cited above.

This brings us to a more serious failure in the proofs. The course of conduct charged is broken for a long period, during which, we assume, they lived peaceably, or, at all events, demonstrated that they could live together, notwithstanding incompatibility of temper, not yet recognized as cause for divorce in this State. For the next five years no charge is made against respondent in the bill of particulars except one concerning the discharge of a gun out of the window (already referred to, the record showing some confusion about the time of the occurrence), and an alleged threat to burn down the house. She denies that she made the threat. She states that she took papers to the cellar, and burned them in the furnace, and he does not deny that. Meantime, at least one other child was born to them.

We then reach another gap of eight years—from 1909 to 1917—in which no specific charge is made in the bill of particulars. Apparently the thing most complained

of in 1917, was an allegation that libellant was locked out of his house, and required to obtain access by asking a neighbor, who seems to have possessed a key to libellant's cellar, to admit him through the cellar door. This averment recites that all of the doors were locked, that "the children at the time were at the movies and libellant could hear respondent walking the floor in a fit of temper." His evidence concerning the matter is neither clear nor satisfactory. He fixes the time at seven o'clock; does not recall whether the windows were open; does not remember whether he rang the door bell; assumed that the doors were locked by his wife, because "they were locked inside." When he got in, he found his wife there "with her hat and coat on." His neighbor, who aided him in entering, and who had never been in the house before, testified that when they got into the kitchen, respondent came in with her hat and coat on, and that he did not know whether she had been in the house while they were entering or not. Respondent's account is somewhat different. She testified that libellant telephoned to her at about six o'clock that "he wouldn't be home for dinner. I had heard rumors about Mr. Esenwein and a certain woman, and I sent the children to the motion pictures and gave them the front door key, and I took the side door key and went over......and watched my husband in his office." She finally saw him come out of the building and board a car; she took the same car, seated in the rear, while he sat in the front part of the car, ignorant of her presence. She alighted from the car near their home "and rushed up the alley way into the side door and I left it unlocked, and went in and he came to the front door and couldn't get in because the children had the key and he stood around there." She says he was admitted by the neighbor, and that she hid from them and that neither saw her. When libellant and the neighbor went upstairs, she left the house and went to the motion picture theatre and brought home the children. Neither thereafter dis-

cussed the incident with the other, though, she says, he might have entered the house by the side door which she had left unlocked. In its effect in this proceeding we consider the incident trivial. To this period, as near as we can determine, may perhaps be referred the evidence of one witness. Mrs. Smith, a next door neighbor, testified that "On the few occasions we were together she would say belittling things to Mr. Esenwein......"; "just irritating to him, not insulting but just as though she was the manager of the whole establishment......" Such statements are of course subject to the general rule stated above. This witness did not recall ever having been in libellant's house.

After another gap in the alleged course of treatment, we come to the incident referred to in the bill of particulars, as occurring in November, 1919, which, libellant said, caused his departure from his wife and children. Briefly stated, and without regard to whether her suspicions were well founded or not,—even assuming they were groundless—respondent became "angry" because libellant stopped "on the street" to talk to his partner and his partner's wife, in circumstances in which respondent thought she was intentionally excluded from the conversation, and for that she became "criticizing and censuring." Her account is somewhat different, and, it is to be noted, that when he took the stand in rebuttal, he did not deny her testimony or even refer to the subject. She said: "A. We quarreled over a woman that night, and I threatened to tell her husband and he threatened to leave if I would, so he caught me by the wrists and threw me clear across the hall, and I struck my side against the stairway and my health has been impaired ever since. Q. Had that been the first time you had quarreled about that woman? A. Yes, because I never saw anything, but that night I did. She stopped our car there, and she wouldn't speak to me. She just talked to him. I spoke to her a couple of times and she wouldn't look at me, and I was indignant and

asked him to take me home and he never let on he heard me, and they were talking. She had her arm on the front seat. Finally I said, 'Es, will you please take me home,' which he did. Of course, I was indignant after that treatment, and he left the next morning, and that was in 1919."

He testified that when he left he went to live with his partner and his wife, the woman referred to by respondent in the foregoing account.

Another incident of 1919, if considered as reflecting discredit on respondent, is just as discreditable to him. He was engaged in the commission business with a partner, and with one or more employees. He complains that she went to his place of business, toward the end of a business day, found him out, and "when it came time to close the office" wished to remain. The evidence on this subject came from the employee, who said: "She wouldn't go. I went to the policeman in the building and had him come up and she went out in the hall with the policeman." Of this occurrence, the Superior Court appropriately said: "It is not likely a subordinate would take upon himself the authority to eject the wife of one of the firm, unless he had been prejudiced against her by the employer and received authority so to do, and libellant admits that he had before this told the employee to watch her, when she came, to see that she carried no weapons, apparently an entirely unnecessary precaution. The incident throws light on his attitude toward his wife, and his willingness to create a situation which would humiliate her. Such action would naturally be provocative of retaliation on her part."

In addition, there are general accusations to the effect that his "clothes were washed only part of the time"; that she "upset all the dishes and other articles on the table"; "insisted on pulling a large trunk down the front steps"; did not always do the cooking, but left him do it.

He also called a witness who visited them at times prior to 1913, who testified "they always had plenty to eat," "well prepared" and a house "well furnished." He described going to New York with libellant to see a broker to whom respondent had written a letter (not put in evidence) about libellant. This witness said, "She didn't treat him with any respect at all." What she did, except for writing the letter, does not appear. The general statement is without value as evidence. We must also conclude that this letter did not affect libellant adversely, because he does not even refer to it in his testimony. Respondent testified that, in writing the letter, she "meant to help Mr. Esenwein." There is no evidence that the letter injured him.

Another witness, Mrs. Boles, testified that she "visited there and saw her a great deal"; "took some rather long trips, and spent a good many evenings driving and going to the movies." She testified that respondent "would argue about things and start an argument." These arguments took place "mostly in......Mr. Esenwein's car," in the presence of his children.

Libellant said respondent's conduct made him a "nervous wreck." He called a physician to rebut respondent's evidence that he was given to drinking; the doctor testified that he had been the parties' family physician for many years, and never "noticed liquor on him." He was not asked (cf. Hare v. Hare, 95 Pa. Superior Ct. 66, 68) whether libellant showed any symptoms of being a "nervous wreck," or was otherwise adversely affected by alleged indignities inflicted by respondent. In Schulze v. Schulze, 33 Pa. Superior Ct. 325, 332, it was held that a libellant's statement that he became a "physical wreck" amounted to nothing by itself.

It would unduly extend an opinion, already too long, if we recited all the evidence; we have sufficiently shown its general character. There was no course of conduct— no continuity of treatment—with the prohibited result,

within the accepted meaning of the words of the statute. Libellant has not made out a clear and satisfactory case, as required. Instead of a course of conduct, the episodes divide themselves into groups separated by the long intervals of time stated. This lack of continuity is inconsistent with any course of conduct; it excludes the basic element of the definition. Among the many cases on the subject, see Schulze v. Schulze, 33 Pa. Superior Ct. 325, 330; Wark v. Wark, 73 Ibid. 274, 277; Russell v. Russell, 37 Ibid. 348, 354; Richards v. Richards, supra. There is evidence that respondent undoubtedly behaved badly, but it is equally clear that libellant was not free from blame. Indeed, his evidence, in some measure, carries its own refutation, and seriously shakes credibility. He testified that respondent "was not a good mother"; was not "a fit person to live with the children." Yet, when he deserted his family in 1919, he left the children with their mother, though they had then reached ages, about 15 and 17 years, at which, if there had been a contest about custody, their own choice of parent would have been given consideration by the court. After he had testified that respondent was not a "fit person to live with his children," he was confronted in cross-examination with an agreement made by him in November, 1919, providing for their support, in which he recited that he "believes they [children] could best be provided for if under the care of their mother." No reason was given by him for not taking the evidence of these children for this trial twelve years later. He instructed his counsel that respondent hit him on the head with a large cake of soap, swore to the bill of particulars so alleging, but could not support it with evidence. His omission in rebuttal to deny material parts of respondent's testimony, varying the effect of evidence given by him, cannot be disregarded.

The order of the Superior Court is affirmed, costs to be paid by the libellant.