Simon *v.* Simon et al., Appellants.

Argued April 26, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*A. H. Rosenberg,* for appellant.

*M. A. Shapira,* for appellee.

OPINION BY STADTFELD, J., July 13, 1934:

This is an action for divorce brought by the husband, the grounds alleged being cruel and barbarous treatment and indignities to the person. The parties had lived together continuously since 1904, but were not legally married until August 5, 1917. Libellant, at the time of the hearing was 52 years old, and respondent 56. From the time they started to live together, they resided in the City of Pittsburgh. Sometime in 1927, respondent was committed to the City Home and Hospital at Mayview where she continues to remain, and at No. 369, July Term, 1932, of the Court of Common Pleas of Allegheny County, she was duly declared a lunatic without lucid intervals and the Potter Title and Trust Company of Pittsburgh was appointed her committee. The subpoena was served on her committee.

The charges of the libel are cruel and barbarous treatment and indignities to the person. The bill of particulars avers that from 1904 until 1920, the libellant and respondent lived together happily, but from the latter date on the respondent became negligent towards libellant, failed to have his meals ready, became abusive, began to criticize him and accused him of running around with other women; that she was disrespectful to libellant's relatives, viz: his brothers and their wives, called him names, accused him of different improprieties in the presence of libellant's relatives and friends, and on several occasions abused the libellant physically; that at one time she became angry and pulled a door off a sideboard and hit him with it, and another time picked up a chair and threw it at him and hit him, and on several occasions she

threw dishes at him; that she was after him continuously to convey to her certain of his property, and that he did convey to her a piece of his property; that she threatened to cut out his heart if he did not do certain things; that shortly before his wife took sick, libellant, by reason of the treatment of his wife, thought he would have a nervous breakdown, lost weight, could not sleep, and became very nervous and restless. The bill of particulars is very general in character, lacking entirely in dates and, except in a very few instances, does not specify any particular acts of alleged cruelty or indignities. Libellant's testimony likewise is very general in character. He testifies that "she used to swear and call me a son of a bitch and everything." After they had been living together for many years "she threatened to poison me if I would not marry her legally" and before they were "legally married" "once she threw an iron at my head, used to throw several dishes at me, and she broke the door from the cupboard, and she hit me with the door;" that after he married her "legally" they got along well for a short time; she began demanding that he should sign all of his property over to her and in 1921 he did sign over to her one piece at No. 18 Webster Avenue; that after that she "occasionally was all right and occasionally was not;" that after 1921 on his refusal afterwards to sign all of his property to her she called him vile names; he testified that the incident when she ripped the door from the cupboard and hit him was before they were married; that after they were married she "used to get sore at the table and throw some dishes, cups, plates at my head whenever she got sore for a certain thing which I didn't want to do, what she wanted me to do"; that she accused him of living with a niece of his who lived with them until 1920 when she got married; he did not claim that she accused him of

running around with other women, as set forth in his bill of particulars; that occasionally she didn't have his meals on time and neglected the house and everything; the threat to cut out his heart was before they were "legally" married; she threatened to put poison in his food before he "signed that house over on Webster Avenue"; that she used to call his mother, who is aged about 85 years, names, from the time she came to live with them for about a year in 1921 when libellant put her out; that his mother came back for a while and libellant again put her out; that respondent became sick in April, 1927, and was taken to the City Hospital at Mayview; he admitted that he did not pay anything to the City or State for keeping his wife at Mayview for five years after she was taken there; he testified that she did not get along well with her neighbors.

Meyer Simon, an adopted son, aged 27, testified to the incident when "she ripped the door out of the cupboard" and hit libellant on the head; the witness said he was very young at the time, but could not approximate the time; "at times she was very nice, other times she got sore at the relatives or she got sore at me, she took it out on him, called him names;" this was in the presence of the witness but not in the presence of other people; while living on Webster Avenue, respondent hit libellant with an iron, and when sitting at the table she would throw a cup or saucer at him. He could not definitely fix any particular date. He testified that he never heard respondent call his grandmother names; that he was never present when respondent accused libellant of being intimate with the latter's niece. On cross-examination, he admitted that about a year before he told Mrs. Schwartz, a sister of his mother, that so far as he knew his mother always treated his father well, but claimed he didn't say that all the time; that he might also have told

her that his father had no cause for divorce but did not remember.

Katie Kubitz, a niece of libellant, was called as a witness. She testified that respondent had accused libellant of living with her. Her testimony was of a very general character and attempted to testify to matters which had been told her by her grandmother. Nathan Simon, a brother of libellant, testified that he lived with libellant for eight years from 1911; that he visited his brother when the latter lived on Webster Avenue, between 1921 and 1927; he testified that respondent treated libellant "very good" the times he was there; he never saw her do anything to him, in his presence; that about 20 years ago, respondent threw an iron at libellant, but it did not hit him; that she threw dishes at him and called him vile names. His testimony was not only general but vague and lacking all dates.

On behalf of respondent, quite a number of close neighbors and associates were called who testified to the cleanly and orderly manner in which respondent kept her home; that she did her own work and that apparently she and her husband got along well together; that they never saw or heard any disturbance in the home of the parties, and never heard of any complaints and never observed any improper conduct on part of respondent.

Libellant's mother was not called as a witness. Although libellant claimed that his health was affected, he did not call any doctor, nor did he claim to have required any medical treatment.

The lower court, McNAUGHER, J., granted a decree on the ground of indignities only, and, in his opinion filed, recognizes at points the rather general character of libellant's testimony.

It is our duty to examine the evidence de novo for the purpose of review: Nacrelli v. Nacrelli, 288 Pa. 1,

4, 136 A. 288; Esenwein v. Esenwein, 312 Pa. 77, 167 A. 350.

Almost the entire testimony of libellant and his witnesses is most general in character. The alleged acts of which libellant complains are spread over a period from 1904 till 1927, many of them prior to 1917 when they were "legally" married. Some of the witnesses called on his behalf do not corroborate him; the allegations as to failure to have his meals on time or being neglectful of her home do not constitute any basis for a divorce: Esenwein v. Esenwein, supra. The language of Brother PARKER in Dailey v. Dailey, 105 Pa. Superior Ct. 461, 161 A. 475, is most applicable in the instant case: "The libellant being required to file a bill of particulars, placed upon the record general charges of misconduct with an unusual scarcity of particulars. The evidence furnished at the hearing was of this same general character with a dearth of testimony describing particular acts of misconduct with dates and surrounding circumstances. Evidence given in this manner furnishes nothing more than the conclusions of the witnesses and does not supply proof of the charges.

"We are called on to give careful consideration to the evidence to ascertain whether it is sufficient to establish the statutory grounds for a divorce, and this for the reason as was said in Richards v. Richards, 37 Pa. 225, that divorces ought not to be easily obtained, and the marriage relation should never be dissolved without clear proof of imperious reasons." Biddle v. Biddle, 50 Pa. Superior Ct. 30. The burden of proof is upon the libellant to establish every essential fact by clear proof of imperious reason and it is our duty to scrutinize it with proper care. Buys v. Buys, 56 Pa. Superior Ct. 338; Aikens v. Aikens, 57 Superior Ct. 424; Heimer v. Heimer, 63 Pa. Superior Ct. 476." This is particularly true in the instant case

where respondent, because of her unfortunate condition, was unable to be present at the hearing and controvert the testimony produced against her.

After a careful reading of the entire testimony, we are of the opinion that libellant has not made out a clear and satisfactory case as required, and we do not find sufficient evidence in the record to warrant an affirmance of the decree.

The decree is reversed and the record remitted to the court below with direction that the libel be dismissed. Costs to be paid by libellant.