## James *v.* James, Appellant.

480

Argued December 18, 1936. 

 Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, and JAMES, JJ. 

*William G. Barthold,* for appellant.

*Daniel L. McCarthy,* for appellee.

OPINION BY JAMES, J., April 15, 1937:

On March 5, 1934 libellant filed his libel in divorce, in which he alleged that respondent by cruel and barbarous treatment had endangered his life, and had offered such indignities to his person as to render his condition intolerable and life burdensome. In answer to respondent's petition, libellant filed a bill of particulars, to which respondent filed her answer denying

the allegations. A master was appointed, who, after hearing much testimony, recommended the granting of the divorce on the ground of indignities. Exceptions to the master's report were dismissed by one of the judges of that court, and later the court in banc approved the decree.

It is unnecessary to refer to the many authorities that have established the duty of this court to examine the entire record and determine on our independent judgment whether the record sustains the grounds alleged in the libel. We, of course, must give due weight to the conclusions of the master and the lower court, yet our duty is clear: *Upperman v. Upperman*, 119 Pa. Superior Ct. 341, 181 A. 252.

Libellant and respondent, now aged 42, were married on May 8, 1915 and resided together at Seipsville, Northampton County, Pa. They later resided at Allentown, Catasauqua, Nazareth and at Bethlehem, where they lived at the time of the separation on January 6, 1934. On January 30, 1934 libellant and respondent entered into a separation agreement, in which libellant agreed to pay his wife the sum of $60 per month during her natural life. At the time of the marriage, libellant was a farmer, but since 1922 has been employed as a fire prevention engineer by the Bethlehem Steel Company.

Libellant's testimony, briefly stated, is as follows: The first unpleasant incident arose about ten days after the marriage, when he failed to bring in some wood, which caused respondent to rage and storm at him and strike him with her fist on his breast. Shortly afterwards, the wife refused to accompany her husband to Bryn Mawr where he was employed for several months, and later she refused to permit the sale of their furniture preparatory to their going to Montana. Until final separation, respondent displayed ungovernable rage on the slightest cause, such as dropping water

on the floor when he was drying the dishes; made slurring and critical remarks about his personal appearance and his dress; was constantly picking on him in the presence of others; refused to permit him to lie on the bed during the day; on various occasions refused to permit him the use of the radio; that nearly every week since the marriage, struck, bit and scolded him and bit him at least once a week during the time they slept together; that in 1931 she struck him with an electric cord from a lamp from which he had welts on his head and shoulders; and that on February 2, 1932, while he was taking ashes out of the cellar, through the folding doors of an outside entrance, the wife threw down the doors causing a severe wound on his head and breaking his glasses. He did not say that he saw his wife cause the doors to fall on him, yet believed that she did. He further testified that to avoid having children, respondent insisted that they satisfy their sexual passions in an unusual way, the details of which we deem unnecessary to recite. Since June, 1931 they have not slept together. Since 1922 libellant was absent from the home about seventy per cent of the time, but whenever away wrote endearing letters to his wife and always kissed her upon his return. He complained concerning the conduct of his wife and her sister in calling up some of his acquaintances on the telephone. These conversations were frequently had in his presence and without any remonstrance on his part. As to the circumstances under which libellant separated from his wife, he testified on direct-examination: "Q. ...... Will you tell us what the conversation was that you had with your wife just before leaving or at that time? A. Well, the conversation was about children partly, not having children, and about many other things. I told her I was convinced that she didn't love me because I felt that love was a matter of giving ...... I told her that I finally

felt that the type of relations that we had were so obnoxious to me that I absolutely couldn't stand it a day longer and that the first of the New Year I was going to turn over a new leaf and try a new life; and I recalled to her how she called various members of my family boobs and how she refused to cooperate in any way; and I even reminded her of the time that she told me when she looked in my eyes at one time it turned her stomach, and I said that I felt the same way now, I absolutely couldn't live with her under these conditions with the type of sexual relations that we were having, it was just repulsive to me and I couldn't stand it any longer. Q. Is that all the conversation? A. That was practically about it. We reviewed various phases of that from September until January when I left ...... Q. What was said about not having children or not wanting to have children at that time? A. I told her when she definitely refused me in 1931 to have children that from that point on I felt there was no hope to change her attitude. Q. Well, did you tell her you wanted children or didn't you tell her that, or she didn't want to have children? A. I told her about children at different times throughout my married life, but in 1931 she gave me a definite answer that she absolutely would not have any children, in 1931, in the spring of 1931. Q. That is what she told you in 1931? A. From that minute on I started to lose hope, and when I was ready to leave in January I had lost all hope and her relations were so repulsive to me that I had to leave, I couldn't continue under any circumstances."

Marcus B. Church, who roomed at the home of libellant and respondent, testified as to an incident occurring about 1916 while the parties were living on a farm near Catasauqua. Libellant and Church had gone by automobile to meet respondent, who had visited her mother in Allentown, and on the return journey re-

spondent, who was angered because of the lateness of their arrival, 'knocked off libellant's skull cap. In detailing respondent's conduct towards libellant, Church testified as follows: "She often said why didn't he look like other men and keep his hair close; and his clothes, maybe his shoes would not be tied or he would have two odd shoes on. It was nagging or belittling in regards to his dress in front of me and the others who were there." Charles Kuhn, a fellow-employee, testified that he was phoned by libellant to come to his home on the day libellant was injured by the cellar door. When he arrived, he found libellant sitting in his living room, his face a mass of blood. He told the witness the cellar door had fallen on his head while carrying out some ashes. Respondent was in the room at the time. Kuhn frequently visited at their home and observed that respondent was always bickering and fault finding, largely as to libellant's sitting posture, mussed hair and his sitting on the counterpane.

Dr. Margaret R. James, libellant's sister, testified: "A. I know that in my presence he was told, 'Alfred, don't;' 'Alfred, sit up straight;' 'Don't touch the curtains;' little things like that. It was just indicative of her attitude." Mary R. Lynch, another sister of libellant, testified: "A. She was always criticizing him for various small matters. ...... I can't recall the words. She was always objecting. 'Alfred, fix your hair,' 'Alfred do this,' 'Alfred, fix your tie,' and said it in an annoying manner."

Respondent denied that she ever gave her husband any cause to separate. She admitted that on occasions she had slapped him when he became too rough with her or pinched her, and that whatever misunderstandings took place were patched up before they went to sleep. She admitted striking him over the arm with the electric cord, because he had cut the cord from a bridge lamp and when she struck him, libellant slapped her

face. During the first year of their married life, they had natural intercourse until she went to a hospital; and that their failure to continue it, was because of libellant's wishes to avoid having children. She explained that her failure to go with her husband to Bryn Mawr was that there was no room for her, during which time she stayed with her sister at Catasauqua; and her refusal to go to Montana was because he had no job awaiting him. Respondent called in corroboration a neighbor, Mrs. Paul Bishop, who frequently visited at respondent's home, her sisters, Mrs. E. H. Schall, and Mrs. W. H. Stahlnecker, and her brother-in-law, W. H. Stahlnecker. Their testimony was that they never heard or saw anything that would indicate that the marriage relation was not happy. Libellant and respondent had lived with Mrs. Schall for more than two years and with Mrs. Stahlnecker for six weeks, and Mrs. Stahlnecker had stayed at James' for six weeks in 1931. Although denied by libellant, respondent, her sister, Mrs. Stahlnecker, and her husband testified concerning a conversation had with libellant shortly after the separation, in which libellant admitted that he had no grounds for divorce, but would provide an opportunity for obtaining sufficient proof for respondent to obtain the divorce.

"At the outset we may say that while the law of this State is liberal as to the number of grounds for which a divorce may be obtained, it is strict as to the requirement of proof necessary to obtain it. The ground or grounds alleged in the libel must be clearly established by the evidence in order to warrant a decree of divorce": *Putt v. Putt,* 118 Pa. Superior Ct. 74, 180 A. 92.

It is not with isolated occurrences that the law concerns itself in determining whether a divorce should be granted upon the ground of indignities, but of such a course of conduct, so repeated and so continuous, as

to render the complaining party's condition intolerable and life burdensome: *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350. "Such indignities, we have frequently said, 'may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient': *Breene v. Breene,* 76 Pa. Superior Ct. 568": *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 174 A. 821; *Kett v. Kett,* 117 Pa. Superior Ct. 236, 177 A. 509.

"In considering whether there is that 'clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce......the court must be informed what the respondent has done; not what witnesses may conclude, or what they may regard as the character of the conduct': ...... General expressions 'are of no value unless accompanied by the actual facts on which these assertions are based. We are entitled, in the consideration of the case, to have the particulars as to the words spoken or the things done that constituted the cause of action alleged': *Ford v. Ford,* 67 Pa. Superior Ct. 350, 352": *Esenwein v. Esenwein,* supra.

Viewed in the light of these principles, we are not convinced that the libellant has produced such satisfactory proof as warranted the granting of the divorce. Excluding certain testimony, which we shall discuss later, the testimony presents the history of a marriage which, to the outside world, was happy and content. It no doubt had its squalls and storms, but apparently they were soon forgotten. To establish the continuity and nature of the indignities, libellant's testimony consisted almost entirely of their personal and intimate relations, which naturally happened when they were alone and which permitted of no corroboration. Dur-

ing all this time, his behaviour towards his wife in the presence of others indicated happiness and contentment. It is difficult for us to believe in the truthfulness of such testimony, in the light of his behaviour. In his desire to obtain a divorce, he has magnified incidents, which, at the time they happened, were either trivial or for which he may have been partially responsible. In corroboration of his story, libellant called four witnesses, two of whom were his sisters, and the strongest inference that can be drawn from their testimony is that the wife was of a nagging, fretful and critical temperament, relating largely to criticism of libellant's careless dress and slouchy attitude. In none of these criticisms do we find anything directed at the libellant, but largely at his own indifference in personal dress. In corroboration of his testimony, that he suffered from the alleged indignities, he has presented three specific instances occurring at such great intervals that they do not establish such a continuous course of conduct as indicates any feeling of settled hate and estrangement against the libellant; but rather indicate that they were the result of a quick temper and perhaps some degree of blame on the part of the libellant. The first instance occurred in 1916 when respondent knocked off a skull cap from libellant's head. Fifteen years later he brings forward the incident of the blows from the electric cord, inflicted upon him in the presence of respondent's sister, as a result of which, according to respondent's testimony, he slapped her in the face. In 1932 he attempted to charge her with throwing down a cellar door causing a cut upon his head and breaking his glasses. He does not say that he saw her do it, and the fellow-employee, who was called immediately after the happening of the incident, testified that libellant said the door fell on him, which was indeed not an improbability in view of the manner of the construction of the doors. Our

view of this record has persuaded us that the incidents of the kicking, striking and biting are largely matters of afterthought, and that the real cause of libellant's separation was the matter of their sexual relations. Conceding that libellant's testimony in this respect is true, for sixteen years he satisfied his passions in an unusual way, and whether he ceased this practice, because of their nature or for other causes, the real cause of his separation was his inability to indulge in sexual intercourse; which has been repeatedly held not to be such an indignity as justifies the granting of a divorce: *Johnson v. Johnson,* 31 Pa. Superior Ct. 53; *Platt v. Platt,* 38 Pa. Superior Ct. 551; *McCommons, Jr., v. McCommons,* 85 Pa. Superior Ct. 323.

To justify this decree, it must be based solely upon libellant's testimony, as the corroborating testimony was not sufficient. In the main features, libellant's testimony was flatly contradicted by the respondent. "A decree may be supported by the testimony of the complainant alone, but if this testimony be contradicted and shaken by the respondent and there be no convincing circumstances warranting a disregard of the contradictory evidence, a case has not been made out": *Twaddell, Jr., v. Twaddell,* 95 Pa. Superior Ct. 429. We are not convinced that libellant has produced satisfactory proof which the law requires to sever an apparently happy marriage relation of nineteen years.

Decree reversed and the libel dismissed.