LaClair *v.* LaClair, Appellant.

Argued April 20, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Eugene C. Sloan,* with him *Lutz, Ervin, Reeser & Fronefield,* for appellant.

*D. W. McDonald, Jr.,* of *McDonald, Cray & McDonald,* for appellee.

OPINION BY CUNNINGHAM, J., September 29, 1937:

In this divorce action the master recommended and the court below granted a decree in favor of the husband on the ground that his wife "did offer such indignities to the person of libellant as to render his condition intolerable and his life burdensome." Respondent appeals.

"Indignities" as a ground for divorce in this state have often been defined by our appellate courts and there is little dispute as to the principles of law applicable in such a proceeding. Each case must depend upon its own facts. As this court stated in *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 446, 174 A. 821: "It is, of course, impossible to lay down any general rule as to what constitutes such indignities to the person as to render the condition of the injured spouse intolerable and life burdensome; such matters necessarily depend upon all the circumstances of the particular case and the position in life, character and disposition, of the parties: *Richards v. Richards,* 37 Pa. 225; *Aikens v. Aikens,* 57 Pa. Superior Ct. 424; *Sharp v. Sharp,* 106 Pa. Superior Ct. 33, 161 A. 453. It is well settled, however, that it is not with isolated occurrences that the law concerns itself in determining whether a divorce should be granted upon this ground, but only with indignities,

so repeated and continuous as to constitute a course of conduct which renders the complaining party's condition intolerable and life itself a burden: *Esenwein v. Esenwein,* supra, [312 Pa. 77, 167 A. 350] *Dailey v. Dailey,* 105 Pa. Superior Ct. 461, 161 A. 475; *Sharp v. Sharp,* supra. Such indignities, we have frequently said, 'may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient': *Breene v. Breene,* 76 Pa. Superior Ct. 568; *Koontz v. Koontz,* 97 Pa. Superior Ct. 70; *Sharp v. Sharp,* supra."

The burden of proof is upon libellant. He must establish his case by clear and satisfactory evidence and the weight of the evidence must be in his favor: *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69; *Rinoldo v. Rinoldo,* 125 Pa. Superior Ct. 323, 325, 189 A. 566.

The parties were married in February of 1928, libellant being at that time twenty-nine years of age and respondent twenty-two. Two children were born, a boy and a girl, seven and five years old respectively at the time of the hearing in 1935.

During their married life libellant held various positions at different places with the result that they did not have an established home at any one place for any considerable period of time. At the time of their marriage, libellant was manager of the Bell Telephone office at Clearfield, Pa., where they resided at the home of respondent's grandmother.

In June of 1928 libellant was promoted to manager of the company's office at Reading at a salary of $3,600 per year. Respondent did not come to Reading to live with libellant until March of 1929. About the beginning of 1930 he resigned his position with the telephone company and entered the life insurance business. It

proved unprofitable after one successful year. By reason of their financial difficulties they broke up house-keeping in Reading and respondent returned to her grandmother's home in May, 1931, libellant remaining alone in Reading with his insurance business.

In October of 1931 libellant obtained a position with the Aetna Insurance Company at Harrisburg at a salary of $200 per month. His wife and family remained in Clearfield with the grandmother. The Aetna Company closed its office in Harrisburg in November of 1932, and libellant, after doing some work around Philadelphia, returned to Uniontown where he lived with his parents. Respondent remained at Clearfield.

Libellant was without employment until October, 1933, when he secured an executive position with the National Reemployment Service, a federal project, at Uniontown. Respondent and the children remained at Clearfield until June of 1934. Libellant was then transferred to the Service headquarters at Norristown and the parties resumed their family life and established a home at Ardmore. They lived at Ardmore from June until October, 1934, when libellant left their home and his position at Norristown and returned to the home of his parents in Uniontown. When the libel was filed in August, 1935, respondent was living with her parents in Ardmore.

Libellant's testimony regarding the alleged indignities suffered at the hands of his wife may be thus illustrated and summarized: He stated respondent always showed a dislike for his associates in the telephone business, refused to entertain them at their home, was suspicious of his relations with his secretaries both at Clearfield and at Reading, and, as a result of her attitude, he finally resigned his position with the telephone company. According to libellant, respondent was particularly jealous of a Miss Henry, employed in the Clearfield office and a Miss Naffsinger in the Reading office.

On one occasion, libellant received a check for Miss Henry by special delivery at their home, it being customary for telephone employees to receive their checks through their superior. This irritated respondent who thereupon berated libellant for the remainder of the night. At another time, during a party at a hotel in Clearfield, libellant and respondent both accepted the invitation of a fellow employee of libellant to go upstairs and have a drink during an intermission; respondent, however, on learning that the invitation was to come to Miss Henry's room, refused to go and created "considerable unpleasantness." While respondent was confined in the hospital at Reading, libellant's employees sent her flowers; she read the card, threw it on the floor and ordered the flowers taken out of the room.

One icy night libellant was unable to get back from an auto trip to Harrisburg until nine o'clock the next morning. He testified, "And on my arrival I got no reception or sympathy for the nasty experience I had had and the dangerous experience, and I was accused of being out all night with some woman."

Although libellant was elated over his promotion to manager of the Reading office, he stated that when he informed respondent of this promotion she said she would not go to Reading and he would have to resign.

Respondent in her testimony admitted she was jealous of Miss Henry for a short time but said, "I realized that I had been wrong, and it was just forgotten." She denied she ever accused libellant of infidelity, but stated she did disapprove of his entertaining his young lady employees at their home in Reading because she did not think it good discipline or proper for a man in libellant's position. Respondent said she would not go to Miss Henry's room at the hotel on the occasion referred to because she overheard one of the telephone employees in the room call libellant "Bill", which she

thought undignified. She stated she accepted the flowers sent her while in the hospital and wrote a note of thanks to the employees who sent them.

It is quite evident, considering respondent's testimony along with certain admissions in libellant's, that he resigned as manager of the Reading office because he was to some extent dissatisfied with that position and believed he could increase his income in the long run by entering the insurance business, and not because respondent's attitude toward his employees and his position practically forced him to resign. Respondent testified that libellant sent in his resignation only after a great deal of deliberation and after asking her if she was willing to run the risk of giving up a good position in anticipation of greater success in the insurance business. On cross-examination, libellant admitted he went into the life insurance business because he expected to improve his earnings. Respondent denied she ever threatened to leave him if he did not resign from the telephone company. It also appeared from the cross-examination of libellant that for two or three months preceding his resignation, he had been criticized by his superiors for a theft of the company's money by one of his subordinates, and that this criticism, which he resented, may have had something to do with his resignation.

Other alleged indignities consisted of respondent's refusal to entertain properly his friends and business associates in their home, and more particularly her attitude toward his parents and the other members of his family when they came as visitors.

Libellant testified that while they were living at Reading his father 'phoned him and said he and libellant's mother were coming to visit them and would arrive the next evening, and that while he was in the basement fixing the furnace respondent called his father and told him not to come as they had had an argument

and libellant had just beaten her up, that she was covered with bruises and did not want libellant's parents to see her in that condition. Libellant's father corroborated him as to the 'phone conversation, but testified that he visited them anyway during the next two days and saw nothing unusual. He said respondent admitted she and libellant were quarreling but there had been no fight.

Respondent admitted calling her father-in-law and telling him not to visit them because they "were having some trouble and [she] thought it was best for them not to come down, that things would probably not be pleasant." She added that the argument had been over libellant's spending fifteen dollars to join a local club and denied telling his father that libellant had beaten her.

Several other incidents relied upon by libellant arose out of a somewhat peevish attitude upon the part of respondent toward entertaining members of her husband's family and business friends invited to the house by him. Referring to an occasion upon which libellant invited several acquaintances to the house for a drink, respondent testified that after they left libellant berated her for being inhospitable toward his friends and stated he was going back to Uniontown with his parents where he could do as he pleased. When she said, "Your father is a fool if he permits you to do it" he grabbed her, threw her on the floor, beat and kicked her. Libellant then made preparations to leave; respondent begged him not to go; more argument ensued and respondent's father and brother came in just as libellant was pushing her back over the dresser. Her brother knocked libellant down while her father attempted to separate them.

The climax of the indignities alleged to have been suffered by libellant occurred, according to libellant, at their home in Ardmore the evening of October 1,

1934. Some friends from Uniontown visited them that evening and did not leave until about one thirty in the morning. As libellant and his wife entered the house after seeing the friends off, libellant states, respondent said to him, apparently for no reason, "I want you to get out of here and I don't want you to ever come back and if you do I am going to kill you." Later, libellant went to the cellar to fix the fire. While there he heard what he thought was a shot followed by breaking glass. Upon investigation, he found the explosion came from ginger ale bottles which respondent had thrown down and which had exploded on the cellar floor. During the night libellant awoke and saw the figure of his wife at the foot of the bed "come up and then go down several times." While lying there he heard the sound of metal; he sat up and saw his wife had a pair of scissors. He spent the rest of the night downstairs, dressed and went to the office the next morning. He returned that evening with his brother and obtained some of his clothes. He then returned to Uniontown to the home of his parents. About that time he was arrested upon a charge of desertion and non-support.

As to this occurrence, respondent testified that libellant treated her indifferently in front of their visitors from Uniontown and after they left she asked libellant why he had treated her that way lately but got no satisfaction from him. When he went to the cellar and didn't take two ginger ale bottles down as she requested him to do, she "tossed them down in the cellar and they broke on the cement." Later, after turning out the lights and getting ready for bed, she knocked over some metal ash trays on a table as she raised the window. Libellant rose up in bed and asked her what she was trying to do and, upon her answering him, apparently turned over and went to sleep but was missing the next morning.

There is evidence in the record, corroborated by letters, that after Christmas of 1933 libellant's attitude toward respondent cooled considerably, and that thereafter he repeatedly told her he did not care anything about her. Libellant admitted this change of attitude on his part but attempted to justify it because of a conversation he overheard between respondent and her sister Juliette. This conversation related to an incident at a party at the house of respondent's sisters when a certain intoxicated man annoyed the women present by chasing them into the toilet and trying to kiss them. Respondent denied any improper conduct upon her part and testified both she and her sister had repeatedly explained to libellant that there was nothing to the affair. A reading of the evidence dealing with this incident indicates that neither the incident itself nor what libellant overheard concerning it, was sufficient to justify his attitude toward respondent.

The above mentioned incidents cover the substance of the evidence regarding indignities. Certain other evidence was introduced; it was largely cumulative and no good purpose would be served by elaboration. The independent consideration we are required to give this record has led us to a conclusion differing from that of the master and the court below.

The testimony, for the most part, consists of allegations by libellant and denials, qualifications and explanations of those allegations by respondent. As to the principal incidents upon which libellant relies to make out a case of indignities, he is without corroboration. Libellant's father and brother both testified for him, but neither of them were present when most of the alleged indignities took place. The same may be said of the testimony of respondent's witnesses.

The case is one in which the various charges of libellant are either denied or explained by respondent and there is little corroboration of libellant. "A decree may

be supported by the testimony of the complainant alone, but if this testimony be contradicted and shaken by the respondent and there be no convincing circumstances warranting a disregard of the contradictory evidence, a case has not been made out": *Rommel v. Rommel*, 87 Pa. Superior Ct. 511, 513. See also *Wagner v. Wagner*, 112 Pa. Superior Ct. 485, 499, 171 A. 419.

Considering the evidence as a whole, libellant has not convinced us that he has suffered such indignities as entitle him to a decree. Even accepting his version of the various incidents relied upon, they were separated by intervals of time during which the parties lived an apparently normal married life. Following separations, due largely to financial difficulties, they reestablished their home in an attempt to forget past bickerings. Libellant admitted that at times respondent's attitude toward him was tender and affectionate. Certain letters introduced in evidence by respondent, written by libellant to her in November of 1933, show an affectionate disposition and tender regard for his wife and family at that time and tend effectually to refute the charge that his condition was then intolerable or his life burdensome. See *Putt v. Putt*, 118 Pa. Superior Ct. 74, 78-79, 180 A. 92. What the Supreme Court stated in *Esenwein v. Esenwein*, 312 Pa. 77, 87, 88, 167 A. 350, is applicable here: "There was no course of conduct—no continuity of treatment—with the prohibited result, within the accepted meaning of the words of the statute. Libellant has not made out a clear and satisfactory case, as required. Instead of a course of conduct, the episodes divide themselves into groups separated by the long intervals of time stated. This lack of continuity is inconsistent with any course of conduct; it excludes the basic element of the definition."

Undoubtedly the parties to this marriage were not at all times in harmony, but incompatability of temperament is not a ground for divorce under our law. A

considerable part of the difficulty seems to have been respondent's inability to get along with libellant's parents and other members of his family. Unfortunate as this situation may have been, and even assuming that respondent may have been to blame for acting indifferently toward them, the evidence indicates that she did not carry her dislike for his family to such an extent as to amount to indignities to him.

The charge is indignities to libellant's person; not to the persons of the members of his family. The frankness of respondent's testimony is impressive. She admits there were shortcomings and mistakes on her part. She was, doubtless, often partially to blame in causing their marital difficulties. However, a reading of her testimony utterly fails to show her attitude toward her husband to have been one of settled hate and estrangement.

The unfortunate difficulties of the parties were far from insuperable, comparatively infrequent, and not always the fault of respondent. Libellant is not entirely free from some of the charges he makes against respondent. Responsibility for the present unhappy state of affairs seems to be about equally divided.

It is a matter of the highest importance to the State, the parties to the marriage, and to their children that such relation shall not be easily dissolved. As the Supreme Court of this state said in the early case of *Richards v. Richards,* 37 Pa. 225, at page 228: "Never ought divorces to be easily obtained, for marriage is the most sacred of human relations, and should never be dissolved without clear proof of imperious reasons." See, also, to the same effect *Esenwein v. Esenwein,* supra; *Mathias v. Mathias,* supra; *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 304, 181 A. 69, and *Rose v. Rose,* 124 Pa. Superior Ct. 437, 188 A. 595.

Decree reversed and libel dismissed.