Titter *v.* Titter, Appellant.

Argued November 21, 1939.

Before KELLER, P. J., CUNNINGHAM, STADTFELD, PARKER, RHODES and HIRT, JJ.

*William A. Burns,* for appellant.

*William Taylor, Jr.,* for appellee.

OPINION BY STADTFELD, J., January 30, 1940:
This is an appeal by the wife-respondent, in a divorce action by the husband, charging adultery, cruel and

barbarous treatment and indignities to the person, wherein a decree was granted by the court, on the ground of adultery and indignities. The libel was filed May 28, 1937. The subpoena was served personally on the respondent. A bill of particulars was filed by libellant, and an answer to the libel and bill of particulars was filed by respondent. By leave of court, the libel was amended, changing the date of the alleged adultery from 1934 to 1932. The case was referred to a master, who filed his report recommending a decree on the two grounds above stated and recommending a dismissal on the charge of cruel and barbarous treatment.

The record is unduly large, covering 614 pages. After reading the same, we agree with the conclusions of the master and the court below that the charge of cruel and barbarous treatment is not supported by the testimony and the same was properly dismissed.

The parties were married on April 2, 1906, at Lansdowne, Delaware County, Pennsylvania, and have continuously resided at various places in said county until the filing of the libel in this case.

The libellant, at the time of the hearing, was 51 years of age, and engaged in raising vegetables, flowers and evergreens and in landscape gardening. The respondent is 50 years of age, and is not employed outside of her home.

Three children were born of the marriage: Marie Levis Titter, 30 years of age, who is married to Earl Young; John Gordon Titter, 28 years of age, who is an epileptic and resides with the libellant; William Vincent Titter, 26 years of age, who is married and supports himself.

The libel alleges adultery with one John E. Morton and fixes the time as August 1934, and later amended to the summer of 1932. The only act of adultery alleged in the amended libel is in 1932 with John E. Morton, an adopted son of libellant's sister. Morton

testified that he was twenty at the time of the hearing. The hearings having been held in November and December of 1937, he was, therefore, between the ages of fourteen and fifteen years in the summer of 1932. He testified as to one act of adultery, which was objected to. He testified that he had intercourse with her at no other time; that she talked about it many a time to him and re-affirmed this under questioning by the master.

Wayne Bernecker, also a foster son of Mrs. Laura T. Morton, but not legally adopted, testified that he has lived with the libellant's parents at Douglasville for 4 or 5 years, and that one evening when the respondent was there, she and his brother, John Morton, went up to the barn together to get the milk. They were gone for some time and he went up to look for them. He found the milk can in front of the barn door, but did not see his brother and the respondent, so he went to the upper floor of the barn and saw them lying down at the same place on the floor. He testified the incident took place in the early summer "about June", about seven o'clock in the evening, standard time, when it was still light. He first said it occurred 4 or 5 years ago, when he was thirteen or fourteen years old; then he definitely stated it was 1932.

Mrs. Laura T. Morton, foster mother of the two boys whose testimony has been summarized, testified that her son, John, and the respondent went out together, and when they had not returned at the end of half an hour, she sent the boy, Wayne, to look for them. He came back out of breath and said they were up in the barn. The witness corroborated the time of day and season of the year given by the other two, but gave the date first as 1932, then as 1934; the testimony by which she attempted to fix the year was not very clear.

The respondent denied having had intercourse with John Morton in 1932 or 1934 or at any other time. She testified she was in Douglasville in 1932, but John

Morton was not there, and she had not seen him since Christmas, 1933.

John Titter, the libellant, testified he first heard of the Douglasville incident from his sister, Laura Morton, about a week after it occurred. He could not fix the year with certainty but thought "it was nearer 1934". He had previously stopped sleeping with respondent and had not slept with her nor had intercourse with her since he heard of the Douglasville incident. The respondent admitted the libellant left their common bedroom and went to sleep with the son, Vincent, about 1932, but said she used to go to his room to "visit" him for 2 or 3 years. / In rebuttal, the libellant denied such visits.

That is substantially all of the testimony concerning any act of adultery. There is no confession by the respondent, nor was there any accusation of it made to her. It will be noted that neither of these witnesses testified as to any surroundings of the alleged act. The co-respondent himself gives no details, except that intercourse was had. No mention is made as to the condition of dress or undress of the parties. The co-respondent himself does not say where it occurred. All that he knows is that there was one act of adultery. Neither does Bernecker say whether the parties were dressed or undressed, or in what position they were, except that they were lying on the floor. Bernecker testified that he talked with his mother after that, and that John did not stay around but that he thinks he went back to Connecticut the next day.

Mrs. Laura T. Morton, a sister of the libellant herein, testified of the incident immediately preceding the going out to the barn as follows:

"Q. Now, you heard John testify and also Wayne about this occurrence at Douglasville? What is your recollection of it, if you have any?

"A. Well, we were there and we had gone down that

year to spend the summer, as usual, as we had ever since I had the boys.

"Q. Yes.

"A. And that evening, after dark or after supper, why, mother said she had to have the milk from the barn so she asked my son to go out and get it for her. He was always willing to help, you know.

"Q. Yes.

"A. So my brother's wife said, 'I will go with you.' So John was a man that always protected his wife and he had never said things against her."

Therefore, the purport of this testimony would seem to be that it was after dark when they went for the milk and that being the case, the possibility of Bernecker seeing the respondent and co-respondent lying on the floor of the barn is quite remote. She further testified that she said to the respondent, "I can't understand why people can't behave themselves."

She further said that this incident occurred in the summer of 1932, but further testified that the libellant himself was there at the time, yet there was no protest and Mrs. Morton evidently did not feel that the incident was important enough to communicate it to her brother, the husband of the respondent herein.

Quoting from the opinion by Judge HENDERSON of this court, in *Diehl v. Diehl*, 87 Pa. Superior Ct. 545, 550: "Evidence to sustain the libellant's charge should be direct and clear. It is not requisite that the actual fact of adultery be proved, but the testimony must be of such a clear and convincing character as to leave no other conclusion in the mind of a reasonable person."

All of the testimony concerning the alleged adultery is vague and uncertain, and, in view of the denial by the respondent, is not entitled to much consideration.

We do not believe, after careful consideration, that the charge of adultery in the libel, has been supported by the weight of the testimony, and the assignment of error in relation thereto must be sustained.

The libellant further charged that the respondent has offered such indignities to his person as to render his condition intolerable and life burdensome.

The libellant and respondent have had considerable domestic trouble throughout their married life. The outstanding disputes were not so frequent during their early married life, but became incessant as time went on, culminating in a very serious state of affairs.

Two of the children were called as witnesses in this proceeding, and their testimony indicated that they were not in sympathy at all with their mother, the respondent; the daughter had not visited her mother for a great many years. The other son was not called by either side, having asked to be excused, but his wife testified against the respondent.

The libellant called fourteen witnesses to support his contention in this proceeding, and the respondent called but two witnesses besides herself although she has a number of brothers and sisters residing in this vicinity.

The record shows that the respondent was of a cruel disposition and nature. Her hostile manner was directed particularly against her husband, daughter and epileptic son, although she showed the same attitude towards animals, having deliberately walked some distance to get a double barreled shotgun with which she shot a neighbor's dog. On one occasion, she pointed this same gun at her epileptic son; on another occasion she attacked her daughter so forcibly as to cause the girl to leave her home and go to her grandparents' house to live.

A reading of this entire testimony gives the impression that the respondent was very cold-hearted toward her husband and children particularly, apparently without any cause or justification whatever.

The record is replete with evidence of respondent's disposition to violence and of her frequent resort to force. On one occasion, she struck libellant in the eye;

on another occasion, she threw a collie puppy in his face. The specific instances of her attacks upon libellant are numerous and varied. According to the testimony of libellant and his witnesses, it appears that on different occasions, respondent struck, slapped, choked, punched and bit him. She used profane and abusive language at times, and made baseless charges against him, when it appeared that those very charges might, with more foundation, be directed at herself.

The respondent made groundless accusations against her husband, insofar as she charged him with having been found in a compromising position with his niece, and moreover she charged that premises at 6551 Kingsessing Avenue, Philadelphia, Pa., where the libellant delivered farm produce was a house of ill-repute. She failed so utterly in her efforts to besmirch the reputations of the libellant's young niece and the seventy-nine year old tenant of the Kingsessing property, that her counsel declined to press the point in the brief on her behalf. It is seldom that a respondent so clearly proves by the viciousness of her testimony, the type of person she is.

The testimony of respondent consisted of categorical denials. It was self-contradictory and evasive. Respondent undertook to get evidence that he was friendly with other women, but in this she failed absolutely, showing again that it was just an expression of her feeling toward him. It is admitted on both sides, that he was a very hard-working man, working long hours and doing everything he could to provide a good home for his wife and family. The only witnesses called by the respondent were the taxi driver who could give no significant testimony, and Mrs. Lewis, an aged housekeeper on a neighboring farm, who could testify only in a vague way as to the tidiness of Mrs. Titter's housekeeping.

The master did not credit respondent's testimony and we believe justifiably. In *Fishman v. Fishman,* 134

Pa. Superior Ct. 217, 4 A. 2d 543, this court has held that in a divorce case, the report of the master, although only advisory and not controlling, is to be given the fullest consideration, particularly as regards the credibility of the witnesses, as he has had the advantage of seeing the parties and hearing the testimony.

The rule so often stated is that indignities to the person for which divorce may be granted may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, incivility, disdain, abuse, ridicule, and other plain manifestations of settled hate and estrangement: *James v. James,* 126 Pa. Superior Ct. 479, 191 A. 191; *Koontz v. Koontz,* 97 Pa. Superior Ct. 70.

On the whole, the libellant's evidence seems clearly to establish a course of conduct on the part of the respondent which constituted indignities to his person and which is further shown to have rendered his "life burdensome and condition intolerable". In the winter of 1928-29, though in general a healthy man, he suffered a nervous breakdown. In 1933, he was obliged to leave their common bedroom and sleep elsewhere because the respondent would quarrel on going to bed and keep him awake half the night. Finally, he said, she made him nervous so he kept away from her. Some months prior to the divorce proceedings, he left the house entirely, and has since been sleeping in the greenhouse and has not even gone home for his meals.

Our independent conclusion from the testimony agrees with that of the master and the court below, except as to the charge of adultery. With that modification, the decree of the court below is affirmed.