## Koontz *v.* Koontz, Appellant.

Argued April 19, 1929.

Before TREXLER, KELLER, LINN, GAWTHROP, CUNNINGHAM and BALDRIGE, JJ.

*Ralph L. Smith,* for appellant.

*J. Roy Dickie,* of *Dickie, Kier and McCamey,* for appellee.

OPINION BY CUNNINGHAM, J., July 2, 1929:

Harry F. Koontz petitioned for, and obtained in the court below, a decree of absolute divorce from his wife, Martha L. Koontz, from which she has appealed. Her contention is that the trial judge erred in concluding, under all the evidence, that her husband had established his right to the decree. The libel was filed October 5, 1927, under the Act of June 25, 1895, P. L. 308, providing in substance that, where a wife shall have by cruel and barbarous treatment or indignities to his person rendered the condition of her husband intolerable or life burdensome, he shall be entitled to a divorce.

A bill of particulars and answer thereto having been filed, the case came on for hearing before ROWAND, J., and resulted in a finding that the appellee was entitled to a decree in his favor upon the second ground alleged in the libel—indignities to his person. In the absence of a jury trial, we are required to consider all the evidence and express an independent conclusion thereon: Nacrelli v. Nacrelli, 87 Pa. Superior Ct. 162, 288 Pa. 1. The performance of this duty has not been free from difficulty as the testimony of the parties is irreconcilably conflicting and the corroboration of either on vital points quite meagre. The marriage relation is not to be severed unless we are satisfied that the application is made in sincerity and truth for the

causes set forth, and no other, and is fully sustained by the testimony.

The parties were married at Nashville, Tennessee, on February 11, 1922, and immediately after their marriage came to the City of Pittsburgh and went to housekeeping in the bachelor quarters of the husband in the Iroquois Apartments on Forbes Street. Later they obtained a larger apartment in the same building, in which they resided until their separation on April 29, 1926, when the husband went to live at a club and the wife returned to Nashville. Appellee, who is fifty-one years of age, is a dentist by profession, has resided in Pittsburgh for upwards of thirty-one years and maintains an office in the Westinghouse Building. The appellant is a Southern woman by birth, and approximately fifty years old. It was a second marriage for each; no children were born of this union.

In his opinion supporting the decree the learned trial judge remarked that both "showed culture and education" and were "above the average social standing of those persons ordinarily coming into court on occasions of this nature." There was evidence by the appellee that as early as 1923, and continuing through 1924-5 and until their separation in April, 1926, appellant without the slightest justification, accused him of improper relations with the young woman who had been his office assistant for seven years and with the thirteen-year-old daughter of the proprietor of a hotel in Canada where they spent several summer vacations; accused him of flirting with a woman unknown to either of them during a dance given by the Southern Club at a Pittsburgh hotel; and, upon his denial, struck him in the face with her fist; on subsequent occasions pulled a handful of hair out of his scalp and kicked him in the chest; struck him in the face with a clothes hanger, cutting his lips; scratched his face and neck; pointed a

revolver at him and threatened to "fix" him; threw a vase at him; called him a "liar," "a beast," "a cur," and "yellow;" stated that she hated and despised him and that living with him was like living in an alley; and by her repeated charges of infidelity, her nagging and quarreling, all growing out of her irritable, complaining and jealous disposition, seriously affected his health. If appellee's version of the incidents covered by the testimony be accepted, we agree with the court below that they amounted at least to indignities rendering his condition intolerable and and life burdensome. While lacking the full implication of the words "cruel" and "barbarous"—a merciless and savage disposition—they do indicate the insulting and contemptuous purpose and intent involved in the legal meaning of "indignity."

"It is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. It has been held by many courts (see 14 Cyc. 625) that they may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient": Breene v. Breene, 76 Pa. Superior Ct. 568.

Appellant, on the other hand, flatly denied many of appellee's statements (particularly that she ever charged him with infidelity); conceded some and explained others. She admitted many quarrels, culminating in physical violence, but contended that they were always provoked by appellee and asserted that most of them had their inception in invidious comparisons by him of her value to him as compared with that of his office assistant. In general, she charged that appellee treated her with cruelty; frequently in-

flicted physical injuries upon her, choking and bruising her and cutting her eyelid; and deliberately engaged in a course of conduct calculated and intended to render it impossible for her to live with him. There is ample corroborating evidence from their respective physicians and associates (and from appellee's barber) that each of them on four or five occasions bore unmistakable marks of battle upon their persons, but none of these witnesses saw the actual encounters. Appellee contends that appellant was always the aggressor and that whatever injuries she received were unavoidably inflicted through his efforts to restrain her and protect himself. After a general review of the evidence the learned and experienced trial judge thus expressed his view of the credibility of the parties:

"We have accepted, in consideration of this case, the testimony of the libellant as to these incidents. The respondent also accuses libellant of having at different times treated her in such a way as to leave marks upon her body. We find that the marks were made upon the body of respondent, as fully explained by the testimony of libellant, as results of quarrels or the display of temper upon the part of respondent in which the libellant was acting rather in the defensive than as the aggressor.

"After a careful review of all the testimony, and considering the demeanor of the parties when giving their testimony, and the manner in which they answered the questions put to them, both in direct and cross-examination, in my judgment it justifies the granting of the petition of libellant and the entering of a decree on the ground of indignities to the person."

In Krug v. Krug, 22 Pa. Superior Ct. 572, our present President Judge Porter said: "When witnesses who are competent and equally interested flatly contra-

dict each other, the conclusion of the judge who heard them, as to which is to be believed, is not to be lightly disturbed. ...... The contention of the appellant that a divorce ought not to be granted when the testimony of the libellant is not corroborated and is flatly denied by the respondent, is not well founded. The law has made the libellant a competent witness. Whether credible, is a question to be determined by the tribunal which is to pass upon the facts.''

We have not had the advantage of seeing and hearing the parties and their witnesses, but, after a careful review of all the testimony and after considering the source, the nature and the extent of the corroboration to be found in the record, a majority of the members of this court have reached a conclusion in accord with that expressed by the court below. It would serve no useful purpose to discuss in detail the various incidents covered by the testimony; a reference to a few of them will illustrate the grounds for our conclusion.

Probably the strongest corroboration of appellant is found in the testimony of a servant who stated that one evening after dinner she heard an altercation during which appellant said, ''If you are going out for a drive, I am going with you,'' and that as the witness came out of the kitchen she saw appellee choking appellant and got between the parties to protect her. On cross-examination she stated the incident occurred at the door leading from the apartment into the corridor and that appellee had his hat on and went on out into the corridor. Appellee's version of the incident reads: ''Q. Do you recall the occasion of that particular quarrel? A. I think it was just one of the general quarrels and I got so worked up that I said, 'I am going out and take a ride.' She said 'I am going with you.' I said, 'No.' I had a hard day at the office

and she kept on insisting and as I went through the door I forced her back and this colored maid came out and said, 'Don't do that, Doctor.' I remember that distinctly, and I told her this was our affair and not to meddle in it. Q. Did you choke her on that occasion? A. Never. Q. Or any other? A. No. Q. Did you ever strike her, Doctor? A. Never, voluntarily, with my fist."

An examination of the evidence relative to the revolver incident indicates that appellant's testimony is somewhat lacking in accuracy. Each had a revolver; appellant kept hers on one side of a double wardrobe and appellee's was in his chiffonier. It is not questioned that the incident occurred on April 20, 1926, about ten days before the parties separated. On that evening appellee attended a meeting of a dental society in the city and returned to the apartment about eleven when a quarrel occurred relative to the purpose of his absence during the evening. Appellant's statement was that she had been ill for some days and had just recovered; that when appellee came home he demanded the keys to certain trunks preparatory to removing his possessions from the apartment to the club; that although she remonstrated because she was ill he insisted upon her getting the keys; that when she went to the wardrobe searching for them her hand came in contact with the revolver which she picked up and said, "You drive a sick wife. You had better finish her up. That is what you need;" that appellee ran to her and jerked the pistol out of her hand and took it, together with his own, and left the apartment, returning some time later. Appellee's version was that she had entirely recovered from her illness for at least a week; that he did not ask for the keys until a week later than the revolver incident; that she charged him with being "down town with a woman"

instead of attending the dental meeting; that when he offered to prove by the secretary's records and by other dentists who were there that he was at the meeting she said, "You don't expect me to believe those lies do you;" that they got into the usual argument "and finally she ran to the wardrobe she had there and pulled out a gun and pointed it directly at me and said, 'I will fix you.'" Appellee stated that he did not know whether the revolver was loaded but took it from her, obtained his own revolver, and took both of them, along with several shot-guns, down to his office and put them in the safe. The testimony of the physician who attended appellant during this illness tends to corroborate appellee. His records showed that he attended her from the 7th to the 10th of April, and that when he called on the 13th she was out and he considered her discharged from further treatment. All the circumstances seem to indicate that the request for the keys was not made for at least a week after the revolver episode. Appellee is also corroborated to some extent by the testimony of an entirely disinterested witness, a secretary to one of the federal judges in that district, who lived in a small apartment adjoining that occupied by the parties, the doors of both opening into a common hall leading into the main corridor. She testified that she frequently heard appellant and appellee quarreling, sometimes late at night, and to such an extent that she was obliged upon several occasions to close the corridor door to her apartment in order to avoid the annoyance. We quote the following from her testimony: "Q. Did you ever hear the Doctor's voice in these quarrels? A. Yes, I heard the Doctor's voice one night. There had been some dispute at their front door. Their front door was practically three or four feet from mine ...... and I heard him say, 'I have nothing to cover up,' and she

answered, 'You act as if you did.' That was all I heard at that time. Q. You don't know what the subject under discussion was? A. No, I do not. There was a racket at the front door, and argument. ......
I usually closed the door into my little hall and I couldn't hear it. Q. Will you state whether or not you ever heard Mrs. Koontz call the Doctor any names? A. Yes, I did one evening. Q. Do you recall what she was calling him? A. They were at the front door again. This is where a great many of their arguments seemed to be, and she said, 'You beast, God, but you are yellow.' The Doctor was outside the door that night. I closed the door after that. I don't know what else went on."

A perusal of the testimony leaves the impression that there were serious faults on both sides; it is not easy to apportion justly the blame for the wrecking beyond repair of this marriage, but we agree with the court below that the appellee was justified, in the language of Breene v. Breene, supra, in resorting to the courts "to sever a relation no longer endurable."

Decree affirmed.