Upperman *v.* Upperman, Appellant.

Argued March 14, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, PARKER, JAMES and RHODES, JJ.

*Frederick J. Knaus,* for appellant.

*Clarence M. Freedman,* for appellee.

OPINION BY JAMES, J., October 28, 1935:

On February 27, 1931, Charles A. Upperman, Sr., filed a libel in divorce alleging that the respondent offered such indignities to the person of the libellant as to render his condition intolerable and life burdensome. Respondent filed her answer denying the allegations and a master was appointed. Many hearings were held and the record submitted to us covers nearly 700 pages of printed testimony. The master recommended the divorce which report was approved by the court and a decree entered, from which decree the wife has appealed. Since the argument of this appeal on March 13, 1935, respondent has died. The questions for us to determine are, (1) whether the record sustains the decree and (2) whether the death of the respondent has abated this appeal.

(1) We shall not attempt to give the testimony in detail but simply what may be regarded as the high spots of the libellant's and respondent's testimony. Libellant and respondent, both residents of the city, were married July 6, 1898, and have lived continuously in Philadelphia. At the date of the hearing, June 25, 1931, the husband was 57 years of age and the wife about 55. Two children were born, a son and a daughter (the latter educated as a school teacher), both of whom had been married for some years. Until 1924, outside of some little disagreements, their married life had been fairly serene. Libellant then purchased a home where his parents aged 74 and 76 could be provided for. The family consisted of the husband and wife, his father and mother, and infant daughter of the married son who has been raised by her grandparents since she was four days old. Libellant complains that every evening

there was a constant nagging over the care and fussing of his parents which continued until the death of the parents in the spring of 1926. Libellant, who had been engaged in business for himself, entered the employment of Duffy Bros., wholesale dealers in meat, in 1924 and has acted as treasurer and salesman to the date of the hearing. His work began at five in the morning and continued until seven o'clock and sometimes later in the evening, as the result of which his evening meal was uncertain and the wife constantly entered complaint. No complaint was ever made by him as to his meals. He alleges that his wife used the expressions "Newt's come home" and "Adam's come home," but no complaint was ever made by him to her. He further complains that when compelled to remain late at the plant his wife used the expression that he "had to stay down there and put diapers on the cattle," although he admits that it was always said good humoredly, while the wife testified that it was libellant's own expression. Libellant contends as a result of the constant nagging and fault finding he became nervous but respondent would not listen to his ailments as her own ailments troubled her own mind. One evening in particular he complained because the grandchild was struck with a pencil by the respondent for failing to do her lessons and an argument arose whereupon the wife stated, "You don't have to come home if you don't want to bother." Respondent did not curse libellant, did not call him vile names, and the worst language that she directed at him was that she called him a cheap skate because he refused to have the upper part of the house papered and on one occasion called him a cur, and admits that on one occasion he swore at her. His chief complaint was that his wife was constantly nagging him. Stress was made in the master's report and the court's opinion as to the accusation of libellant's friendly relations with the daughter of his employer; yet we fail to find the

record sustains the great emphasis which was made. On direct examination he was asked: "Q. Did she accuse you of being out with anybody else, or make any specific accusations against you? A. She couldn't understand why I had to work so long. Q. Did she make any specific complaint? A. She couldn't say I was out with any woman. Q. Did she ever say that? A. No, sir," and during a direct examination that covers fifty pages of the record we fail to find any reference by libellant that respondent had made any intimations of alleged intimacy with employer's daughter. The first reference as to the relations with this young woman is found on cross-examination as follows: "Q. You knew this girl Ann Taney or Ann Duffy? A. I know her. Q. Her name is Taney? A. I believe so. Q. She has a husband living? A. Yes, sir. Q. You go out with her, do you not? A. I do not. Q. Were there any parties while you were in Wildwood when you went with them and the whole crowd of you were drinking? A. They were some of her friends that were invited down there. Q. It is a fact, is it not? A. It is a. fact that they were her friends. Q. You were drinking with them, were you not? A. Yes, and so was she." Further in his cross-examination he described an incident when he drove the young woman to their summer home at Wildwood and they did not arrive until late, owing as he contends they were delayed by need of gas. He tried to explain the reason for the delay and his wife said, "I wouldn't believe what you say." Again he testified in cross-examination: "Q. Did your wife on any other occasion accuse you of any improper conduct? A. She said something to me about the girl, and she said more than I would say to anybody. She was going in bathing and I was sitting on the porch. I didn't go in. When she passed my wife said, 'There goes your girl, look at her shape?' I wouldn't think of saying that to a young girl, I never passed any immoral remark about her. Q. Did you say anything? A. I

didn't resent it, I just walked away and passed up. Q. You didn't think it worthwhile having any discussion about it? A. No, sir." For more than four years prior to the separation, respondent has slept in a separate room from her husband and the husband and wife have not had any sexual intercourse since. He had never invited her to return and when asked, "Did you ask her for an explanation," replied, "No, I thought if she wanted to leave, let her leave." Libellant further complains that his wife humiliated him in the presence of his friends, in breaking up parties by demanding that he return earlier than he wished, and emphasizes her conduct at a New Year's Eve party on December 31, 1929. During the course of the party, Mr. Duffy, Jr., had poured ginger ale down her back and she complained to her husband, who made light of it. The wife and Mrs. Duffy, Jr., insisted on going home. Libellant and respondent finally left before the new year was in. On Christmas, 1930, libellant worked at the plant during the day, ate his Christmas dinner with the Duffys and when he arrived home went to bed because they barely took notice of him. On New Year's Eve following, libellant got his supper and attended a party at the Duffys where respondent came after him and he took her home. When they arrived respondent called the married daughter who came to the home, and an argument arose between the father and the daughter over a dividend check. The daughter fainted and while still in the faint, libellant fell asleep. Both mother and daughter were crying and libellant went to bed and left the next morning and has not returned except to obtain clothes. Corroboration of his testimony consisted almost entirely of those employed by or connected with libellant's employers, and largely related to incidents occurring at the various parties held, in which the worst that could be said of respondent's conduct was that she did not ap-

prove of the drinking and the conduct of the participants.

Respondent's version of their domestic unhappiness places an entirely different light upon the incidents related by libellant. They both agree that their married life was fairly happy until the additional cares of the baby grandchild were brought into the home. From this time she performed all the household duties receiving help one day a week, and nursed the child. As a result her health was seriously affected. The aged parents, both apparently senile were brought to the home in 1924 and their case rested upon respondent. The libellant for a long period arrived home late in the evening and as to her complaints as to the conduct of his parents replied, "Forget it," and whenever she attempted to show any affection libellant told her to "chase herself." She testifies that many of his evenings were spent at the Duffys, and that on various occasions he arrived home under the influence of liquor. It is not necessary to detail the conduct of Daniel Duffy, son of the employer, either at the parties or when he visited their summer home at Wildwood. In all we are convinced that the conduct of the visitors, condoned by the libellant, gave justification for criticism of their behavior. She admitted the incident when libellant accused her of hating every bone in his body, and that in a fit of desperation because he refused to believe her denial she turned on the gas which was turned off when discovered by libellant. Respondent admitted that she had complained of libellant's accompanying Mrs. Taney and became worried and sick as the result of his behavior. Respondent stayed away Christmas Eve and Christmas Day of 1930 and was called by the daughter to come home for his Christmas dinner. He did not arrive home until between nine and ten in the evening, refused to accept the Christmas presents and soon went to bed. One New Year's Eve, libellant not having returned home, re-

spondent went in search of him and found him at Duffys. Libellant cursed respondent on the way home; when he arrived home, he demanded his clothes, but respondent refused to allow him to take them. The daughter was then called by telephone and she and her husband came. Efforts were made to settle their differences in the course of which the daughter fainted. Both the daughter and son-in-law pleaded that he behave better toward the mother. Respondent testified that she attempted to show every affection for her husband but was repulsed. On both occasions when he returned for his clothes, respondent pleaded for him to remain; that on the last occasion he kissed respondent and the grandchild goodbye and promised to return; that after this she called him many times to return home. Respondent's physician testified that he had treated her for a gall bladder and liver condition, arthritis and a heart condition, that she was naturally a nervous woman of a hysterical type and that this condition had existed for some time. The daughter told a straightforward story, corroborating the mother in many respects and made efforts to reconcile them.

The present proceeding is a very unfortunate ending of a married life of thirty-three years. After raising two children and one grandchild, to have their lives marred by a voyage into the courts to settle their domestic trials, is indeed tragic. The husband, a hard-working provider, was gone from early morn until late in the evening, during which time the wife, suffering from her own physical ailments, was left to care for the senile parents and the infant child. Surely, it was not expected that she could always be demonstrative in her affections, while on the other hand, he was entitled perhaps to hear other tales than complaints of her troubles during the day. Age should have taught them at least to be patient with each other's trials. The wife was compelled by the care of the child, to remain at home,

while the husband remained away in the company of those of a more congenial and convivial nature. Tragic as the end may have been, we fail to find in this record that type of indignities which our courts have recognized as justifying the severance of the matrimonial bonds.

It is unnecessary to refer to the many authorities that have established the duty of this court to examine the entire record and determine on our independent judgment whether the record sustains the grounds alleged in the libel. We of course must give due weight to the conclusions of the master and the lower court, yet our duty is clear.

It is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. We have frequently said that "they may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient": Breene v. Breene, 76 Pa. Superior Ct. 568; Koontz v. Koontz, 97 Pa. Superior Ct. 70; Sharp v. Sharp, 106 Pa. Superior Ct. 33, 161 A. 453; Mathias v. Mathias, 114 Pa. Superior Ct. 444, 446, 174 A. 821, 822.

Applying this rule to the testimony we find no evidence whatever of vulgarity, studied neglect or abusive language. The unmerited reproach, under which may be included the complaint as to his familiarity with Mrs. Taney is without merit. To criticize her husband for frequently being in the company of a young married woman, not living with her husband, is a perfectly proper attitude for the wife to take. It is his duty to avoid not only the appearance of evil, but the doing of evil. Under the term malignant ridicule her reference to "putting diapers on the cattle" was good

humoredly stated and respondent's testimony was that it was libellant's own expression. Under the terms habitual contumely and manifest disdain, the record is barren of evidence of scornful insolence or contempt; while on the other hand, the evidence clearly establishes that she performed all her household duties without any criticism by the husband. Nor does the record sustain any manifestation of settled hate and estrangement. On the contrary, on the last evening the mother and daughter were sobbing and the following morning he left without informing his wife. When he later returned, respondent made every effort to persuade him to remain at home. We see no merit in his complaint that he was humiliated among his friends. How can it be said that because the respondent did not freely join in the parties at which considerable drinking took place and her demand that they return home after she had been humiliated, be classified as the ridicule and humiliation which would justify the entry of a decree of divorce. Her non-indulgence in sexual intercourse was evidently with his consent, as he made no effort to obtain it, and even if she had refused, such refusal is not an indignity. In the court's opinion he states: "There are many aggravating things that occur in life but there is nothing so aggravating as a nagging, suspicious and tantalizing spouse," but in order to justify a decree we must have more than such conduct. Aggravating things have never been recognized as grounds for separation. Our analysis of this record convinces us that the nagging constantly repeated by the libellant through his entire testimony, is not the type of indignities which warrants a decree. Upon an examination of the entire record, our judgment is that libellant failed to establish such indignities as entitled him to a decree of separation.

(2) Since the original argument, counsel for appellant and appellee have furnished the court with very

able supplemental briefs upon the effect of the respondent's death. Their industry has been unable to find any case of a similar character decided by our appellate courts but the question has arisen in many other jurisdictions.

Marriage is not merely a personal relation founded upon a civil contract, but it is more, it is a legal status of the parties in which the state is vitally interested in its continuance, and cannot be cancelled or rescinded by divorce proceedings save for grave reasons: Latshaw v. Latshaw, 18 Pa. Superior Ct. 465, 467, and when the court of common pleas has entered a decree, an appeal to this court is of right, which until it is disposed of suspends for all purposes the operation of the decree of the court below: Ponthus v. Ponthus, 70 Pa. Superior Ct. 39, 40. It is not the type of "personal action" which is contemplated by the Act of March 30, 1921, P. L. 55, §35, (a), §35 (f), (20 PS §§771, 776) which authorizes executors and administrators to institute and be substituted as parties to a suit.

The effect of the death of a party to a divorce proceeding has been the subject of determination before many of the courts of the sister states from which decisions the following general rules may be found. "The primary object of suit for divorce is merely personal, that is, to change the status or relation of the parties to each other; to put an end to their relation of husband and wife. ...... In case of the death of either party therefore the principal object can no longer be reached, for the marital relation has been already ended by the death. The court can no longer decree a divorce between parties one of whom has ceased to live, and with the failure of the principal object of the bill, the incidents must also ordinary fail. The suit abates absolutely on the death of a party before judgment and cannot be revived in the name of or against the representatives of the deceased party ......": Divorce and

Separation, 9 R. C. L. p. 414, §214. "And where the plaintiff dies after a final judgment or decree of divorce in his or her favor and the dissolution of the marriage involves property rights, it is generally recognized that the death of the plaintiff does not work such an abatement of the action as will prevent an appellate court from reviewing the judgment or decree on appeal or writ of error in behalf of the defendant; though it would be otherwise it seems if the decree granting the divorce did not affect any property rights, and an appeal by the defendant would abate on the death of either the plaintiff or the defendant": Divorce and Separation, 9 R. C. L. par. 214, p. 415. "Where the judgment or decree affects property rights it is the general rule that it may be reviewed on appeal or writ of error at. the instance of the representatives of the defendant after his death ...... And, likewise, if property rights are involved the judgment or decree may be reviewed after the death of the complaining spouse. If, however, there are no property rights involved, the decree is not reviewable after the death of a party, since in such case the decree applies only to the marriage relation and that is necessarily dissolved. But to render the judgment or decree reviewable after the death of a party it has been held that it is not necessary that it appear from the record that property rights are involved, as if the investigation of the court of review is confined strictly to the record made in the divorce suit, the right of the party against whom the decree passed to have the decree reviewed after the death of the successful party is of little practical worth, for it is not often that the record shows, what if any, property was owned by the party who has obtained the decree of divorce": Divorce and Separation, 9 R. C. L., par. 283, p. 469. Many of the cases sustaining these general principles are collected in 30 A. L. R. 1469.

What property rights are directly involved by the

death of the respondent the record does not fully disclose, although it appears that libellant and respondent were the owners of a property by entirety. The liability of the husband for the funeral expenses, however, would be such a property right or claim as would be directly involved by the determination of this proceeding. We are, however, further of the opinion that a divorce proceeding is of such a character that after a decree is entered, other than property rights are involved. The state is still interested in determining whether the divorce proceeding was properly decided. A determination such as has been made in this case, is a direct finding that respondent's conduct was a violation of her marital obligations. In justice to her, her death should not abate the prosecution of the appeal to determine the correctness of the court's decree.

Counsel for appellant has referred us to the case of Hammond v. Hammond, 9 D. & C. 228, as persuasive in the determination of this question. In that case libellant had filed a libel alleging cruel and barbarous treatment and indignities to the person. The case was heard by a jury who found for the respondent. Libellant moved for a new trial which was argued September 6, 1926, libellant having died September 3, 1926. The court, by HILDEBRAND, J., in an able and comprehensive opinion, held that the action was abated. In so holding, we are in accord, as in the event the court had granted a new trial, the status of the parties would have been in the identical situation as if no trial had been held, that of an undetermined action of divorce, which under all the authorities, would have abated.

The decree is reversed and the record is remitted with direction to enter a decree dismissing the libel.