Opinion by
 

 Stadtfeld, J.,
 

 This is an action of divorce a. v. m., brought January 5, 1935, by the wife, Estelle R. Hess, against her husband, Edwin S. Hess, on the grounds of (1) wilful and malicious desertion, (2) cruel and barbarous treatment, and (3) indignities to the person.
 

 The parties were married on June 20, 1912, but have not lived together since November, 1924.
 

 In addition to the divorce proceedings, it appeared that respondent filed a suit for damages against libellant’s father, alleging alienation of his wife’s affections. This suit was tried once and settled by a payment of a comparatively small sum of money after a new trial had been granted. We mention this only because it furnishes a background for the consideration of the charges in this case and passing on the testimony offered by the respective parties.
 

 A bill of particulars was demanded and filed. It sets forth a continuous course of conduct on the part of respondent, beginning on or about January 1, 1929 and continuing thereafter until the date of the filing of this libel. Libellant alleges therein that beginning on or about January 1, 1929 and continuing until respondent was arrested in September, 1931, by the police of the Borough of Bellevue, where libellant has always resided, respondent, who did not live in Bellevue, made it a frequent practice as often as three times a week, to loiter for long periods of time on the street and at other places in the vicinity of libellant’s home, where he would conduct himself in a conspicuous manner, manifestly intended to annoy, harass and humiliate libellant and hold her up to the pity, scorn and ridicule of her friends and neighbors. She also alleges that after his arrest in September, 1931, respondent continued his efforts to annoy, harass and humiliate her by contacting
 
 *603
 
 friends, neighbors and relatives of libellant who, as he well knew, would report to her, and made statements to such persons of and concerning the libellant and her family, and particularly her father, which statements were of an annoying, harassing and humiliating character. In addition to this course of conduct, she set forth that on two separate occasions, respondent appeared at funerals of uncles of hers, and conducted himself on both occasions in a highly improper, unseemly and indecorous manner. She alleges this conduct continued until the date of the filing of the libel and offered testimony to show that it continued almost to the date of the hearing in this case.
 

 The charge of desertion was not pressed. The case was heard before Marshall, (T. M.) J., without a jury, who filed an opinion in which he stated as follows: “We have no hesitation in concluding and finding that the facts and circumstances set forth in the Bill of Particulars have been established and corroborated by clear, conclusive and convincing evidence of a highly credible nature, and that the greater part of respondent’s testimony in answer thereto, is palpably false and unbelievable.
 

 “It is clear from the testimony in this ease, that the course of conduct of which respondent was guilty was not sporadic or confined to isolated instances, but was steady, continuous, and clearly the result of a carefully planned campaign calculated and intended to annoy, harass and humiliate libellant. It is also clear that such conduct had its desired effect. On many occasions, libellant was greatly embarrassed, greatly humiliated and greatly distressed in mind. On numerous and repeated occasions she was rendered highly nervous, seriously ill, and was forced to take to her bed. Her physical and mental condition, resulting directly from respondent’s course of conduct, became such that there was grave danger to her physical and mental well-
 
 *604
 
 being, if not to her life. This is particularly true of the period beginning about the first of the year 1929 and ending with the arrest of respondent about the middle of September, 1931. We have no hesitancy in finding that while there was no actual physical violence, there was a continuous and repeated course of malicious misconduct on the part of respondent that amounted to more than indignities to her person, and amounted in fact and in law to a very serious species of cruelty.”
 

 It is our duty, as there was no jury trial, to examine and analyze the record and determine whether the learned court reached a correct conclusion:
 
 Langeland v. Langeland,
 
 108 Pa. Superior Ct. 375, 164 A. 816;
 
 Wagner v. Wagner,
 
 112 Pa. Superior Ct. 485, 171 A. 419;
 
 Sloan v. Sloan,
 
 122 Pa. Superior Ct. 238, 186 A. 219. The opinion of the court below, particularly as regards the credibility of the witnesses, is to be given the fullest consideration, as he had the advantage of seeing the parties and hearing the testimony.
 

 Libellant testified in detail as to all of the allegations set forth in her bill of particulars. In this she was amply corroborated by a very considerable number of witnesses who were highly reputable and in every way credible.
 

 Libellant testified that when her uncle, Samuel Johnson, died in August 1930, his funeral was held on August 30th in Willis on’s Undertaking Home. Hess entered the funeral parlor, stared at her, and her sister asked him to leave. He handed her sister a card about the size of a postal card and left. When Mrs. Hess left, Hess and about five or six taxi-drivers were standing outside, and when she came out, he laughed as loud as he could and said, “That is her, that is her.”
 

 The next episode occurred when her uncle, John Johnson, was being buried at Uniondale Cemetery on March 9, 1931. Hess, she claimed, was at the inside entrance of the canopy, and when she saw him she
 
 *605
 
 would not get out of the car, and she testified that her brother got out of the car and had the undertaker take him down to the road and she then went in. When she came out of the cemetery he was standing “there”, grinning about everything,, and he was waving his hat ......“that was his habit.”
 

 About September 14, 1931, a neighbor, Mrs. Besser, came over and told her a man had come upon her porch and said he was Mr. Hess, and that later he had gone back and hid in the bushes and came back out eating a pear, about 3:30 in the afternoon.
 

 Mrs. Hess testified that when Mr. Hess came out from Smith’s yard, which is in back of hers, his person was exposed, his clothes all disarranged, and his trousers open in broad daylight. Respondent was arrested on this occasion. The arresting police officer testified to this occurrence.
 

 Miss Ruth Hayworth, a witness who lived two doors above libellant, and saw her frequently, testified that she saw Hess hide behind a telegraph pole and go on porches. On one occasion, he followed her and “tried to make conversation”; “He asked about the family.” This episode the witness reported to Mrs. Hess. Mrs. Hess would become very nervous when anyone would report to her that Hess was in the neighborhood. The next time she saw him was a couple of weeks later, and he was hiding behind a post. This happened at least ten times,( each time she told Mrs. Hess about the episode and each time Mrs. Hess reacted the same way, becoming nervous.
 

 Mr. Wade Hershberger testified that he had known both parties about twenty-five years and lives about two blocks from the Hess home. He saw Mr. Hess in the neighborhood about the first part of 1929 and that Hess would be standing behind telegraph poles or trees or anything that happened to be around him that he thought was hiding him from some person; that he
 
 *606
 
 used to come to the witness’ place and do the same thing, this going on for about a year and a half or two years. He had heard others tell the libellant about Mr. Hess, and he himself had sometimes told her, and after she would be told about Mr. Hess, “she would become so nervous after she would hear about Mr. Hess and would lose her voice, and once she was so sick she had the whole family upset.” In March of 1931, he saw Mr. Hess at the Uniondale Cemetery where the latter “went through a lot of motions that certainly was unbecoming to the time and occasion, if nothing else.” He had the occasion to observe Mrs. Hess with reference to the reports she was receiving from neighbors, and they would excite her and put her under a “doctor’s care practically all the time.” Her condition during the past five or six years (prior to the hearing, August, 1936) was a matter of concern to the witness, his wife and members of the family.
 

 John P. Teets, another witness testified that since September 1931, he had seen Mr. Hess about three or four 'times. One day the witness was in the Seventh Avenue Hotel, the early part of 1935, talking to a friend, when Hess came over and started to talk about “his wife and her father and he made the remark that he (the father) had a house full of booze and he was in the bootlegging game.” Later the witness reported this to Mrs. Hess.
 

 A number of other witnesses testified to like occurrences. In reply to this showing by libellant, respondent offered only his own testimony which was entirely uncorroborated by that of any other witness. He denied all the facts and circumstances categorically. He did admit his presence from time to time in Bellevue at or near the home of libellant. He¡ did admit his arrest by the police of the Borough of Bellevue in September, 1931. He did admit his presence at the two funerals in question. In those instances wherein he admitted
 
 *607
 
 being present, he offered explanations which were highly improbable. He also claimed in his testimony that there was no trouble, misunderstanding or estrangement between libellant and himself and that libellant did not really wish a divorce from him and that her father was seeking the divorce. He sought to support his claim that the relations between his wife and himself were agreeable by testifying, under oath, that at Ohristmas-time in 1936, one year after the libel in this case was filed, libellant sent him a Christmas gift, enclosing a friendly Christmas card, and produced a greeting card which bore her name in her own handwriting, but no date. Mrs. Hess denied having sent this card at that time and stated that the card was one she had used fifteen years before. It is highly improbable that with a divorce action pending, on Christmas of 1936, appellee would have sent such a Christmas card.
 

 After a careful examination and consideration of the entire record, we are fully satisfied that the allegations in the bill of particulars are fully sustained. The effect of repondent’s conduct was to undermine the health of libellant, causing a highly nervous temperament and necessitating frequent confinement in bed. She was corroborated by her physician, Dr. Sutton, who testified that he could not find any physical ailment which would account for her condition, and no other cause except the fact that her nervous condition was aggravated by the annoyance to which she claimed she was subjected by her husband.
 

 It would be to no purpose to analyze anymore of the testimony in detail; suffice it to say that it fully supports the conclusion of the court below as to the charges of indignities, but does not support the charges of cruel and barbarous treatment.
 
 Koontz v. Koontz,
 
 97 Pa. Superior Ct. 70;
 
 Auerbach v. Auerbach,
 
 98 Pa. Superior Ct. 369. What constitutes indignities has been well defined in many cases, among others
 
 *608
 
 that of
 
 Sharp v. Sharp,
 
 106 Pa. Superior Ct. 33, 161 A. 453, wherein our Brother Cunningham, on p. 35, states: “......It has been repeatedly stated that ‘it is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. It has been held by many courts (see 14 Cyc. 623) that they may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient.’ ”
 

 After a careful examination of the entire record, we have come to the conclusion and are of the opinion that the testimony does not support the charges of cruelty, but amply justifies and supports the findings as to indignities, and that the decree should be modified accordingly.
 

 The assignment of error is overruled, and the decree of the court below, as modified, is affirmed.