Hewitt *v.* Hewitt, Appellant.

Argued May 3, 1939.

Before Keller, P. J., Cunningham, Baldrige, Stadt-feld, Parker, Rhodes and Hirt, JJ.

*A. M. Simon,* for appellant.

*William J. Graham,* with him *William E. Bock Jr.,* for appellee.

OPINION BY STADTFELD, J., June 28, 1939:

This is an action for divorce brought by the husband, James R. Hewitt, against his wife, Irene L. Hewitt. The couple were married August 15, 1924. One child, a daughter, Eleanor Irene Hewitt, was born September 28, 1929, and is now over nine years of age. She resides with the mother, respondent. Libellant finally left his home and separated himself from his wife on December 12, 1937. A libel was filed February 3, 1938, alleging cruel and barbarous treatment and indignities to the person. On April 7, 1938, a bill of particulars was filed and respondent's answer thereto was filed on April 27, 1938.

On October 10, 1938, libellant filed a petition to amend the libel by including an allegation of additional indignities to his person from February 1, 1938 to October 1, 1938. With the petition to amend the libel to add these additional charges, the libellant filed a bill of particulars alleging substantially that from February 1938 and continuing to September 1938, respondent had told numerous parties various things, chiefly that libellant was running around with other women and was intimate with his secretary.

The case was heard before GARDNER, J., without a jury, who granted a divorce on the ground of indignities alone, filing an opinion in support thereof. This appeal followed.

Except where there has been an issue and jury trial,

it is incumbent on this court to review the testimony and express an independent conclusion thereon and adjudge whether it sustained the complaint of the libellant: *Burns v. Burns*, 84 Pa. Superior Ct. 489; *Nacrelli v. Nacrelli*, 87 Pa. Superior Ct. 162; *Koontz v. Koontz*, 97 Pa. Superior Ct. 70; *Huston v. Huston*, 130 Pa. Superior Ct. 501, 197 A. 774.

Libellant testified that beginning a few months after the marriage, his wife, respondent, had accused him continuously for over twelve years, of being intimate with other women and that she had told this to others and named the people. Also, that she had called him a whoremaster.

The mother of appellee died when he was quite young and he, his sister and father became very much attached to each other and maintained close contacts, which continued until his marriage. Appellee testified that appellant objected to his visits to his sister or father, and would not permit the child to visit either of them. Appellee was engaged in business in a small locality (Glassport) and became active in business, fraternal and civic activities and in 1933 was appointed school director and elected in 1935 and continues as school director. He informed appellant of his engagements and appointments and "quite often she would call and try to find out if I was there and when and if I had engagements with them." He testified that appellant would talk to guests at the home and tell them he was not around very much and that he would rather be with somebody else than to be with her.

Appellee testified that he exhibited moving pictures at churches, clubs, and different organizations and frequently gave appellant the money derived from that source which donations he discontinued in 1937 because appellant inquired of him, "What did you pay the other woman?" Appellee testified that appellant said he wanted to be on the School Board to be friendly with teachers and to try to take them out, and she attributed

all his activities to his desire to be out with other women. He testified that her bickerings about his engagements became worse between 1934 and 1937, when he left.

He testified further that he learned of her calling the wives of the different School Board members, and upon telling her of it she admitted that she did; in one instance telling one wife that her husband had been out with appellee and some women. This date is fixed as December 1, 1937.

Mrs. Eva H. Brown, sister of appellee, testified that she was visited by appellant just once in 1932 and that she visited appellant thirty or forty times and went to see the child three or four times a year, always at Christmas; that in 1937, upon the witness' return from Arizona, she went to appellee's home and the child answered the door; that appellant called to the child to come upstairs who obeyed her command and did not return; that in the spring of 1934, appellant called the witness and accused her of having "someone there for him to see" and that "she was just checking up on where he was;" that in December, 1937, the witness had her fifteenth wedding anniversary celebration and appellant called the next morning and said she "had warned him not to visit his family" and "you had a woman for him" and "that for fifteen years he had been keeping a woman named Eve" and that "he has been intimate with that girl in the office."

Mr. Ercole, employed by appellee's company, testified that appellant made calls at the office starting five or six years ago. He testified: "Well, whenever she called, Mr. Hewitt would be out on the road. If he was supposed to be in the office at five o'clock and he wasn't there, she would call about five after and want to know if he was there, and she would call about every ten or fifteen minutes until he got there." This witness also testified that upon his visit to appellant's home in June, 1938, she told him, "He is staying down

at his sister's place where they do things down there that he likes. They have drunken parties and men and ladies fool around with each other."

Frank Wargo, another employee of appellee's company, testified that beginning in 1936, appellant called on the phone "more than would be expected" wanting to know "where he was at." "Wanted to know where Mr. Hewitt was, and what time he got in and what time he left, and what time he would be back, and if he did get back, so he would call back at home." In May, 1938, she asked the witness "what time he got to work in the mornings, and told what time he left in the evenings, and told me about him running around with women," and described them as "school teachers" and "office girls at the Griffin Oil Company," and repeated the same talk to the witness on subsequent visits.

Before the parties separated, appellant called Mr. Griffin, a member of appellee's firm, and told him that "appellee wasn't honest with me, that he wasn't coming in until all hours in the morning" and after the first separation, Mr. Griffin testified, "She continued to call me, wanting me to talk to him ...... and I talked to Mr. Hewitt and had Mr. Hewitt go back ...... in a couple of days, he said it was just as bad as ever, and that he couldn't stay in it, and I said, 'Well, I have done my part.' "

Appellant also talked to Mr. Griffin "about one of the girls that worked in our office and I told her at the time that it was all unfounded." This was before a suit for divorce was entered.

Appellant admitted telling Mrs. Brown about Miss Anderson, the stenographer. She admitted employing detectives; admitted seeing Wargo and Ercole at the times and upon the occasions named by them; admitted talking to Ercole about her husband; admitted talking to Mr. Naser, the Superintendent of Schools, but did not deny any part of his testimony; admitted that she received the fees her husband got for showing moving

pictures and then she described them as "illegal movies" and said "that was the only kind he was paid for" and refused to say over what period she had received that money; she denied that she called the wife of any member of the School Board and when pressed, she testified: "Q. Do you know Mrs. Gressler? A. I don't know her to see her, no. Q. Did you call Mrs. Gressler? A. I called her—when do you mean, if you please? Q. Any time. A. Yes, I talked to her once." She also admitted telling acquaintances that her husband was interested in another woman—"after he had left our home," and in the answer filed, paragraph 13, admitted talking to Mrs. Hartman both before and after libellant left her, and she named the woman in whom her husband was interested as the stenographer, Miss Anderson.

As to appellant's visit to Mr. Naser, the Superintendent of Schools, he testified that she accused her husband and asked him questions. "Q. She accused him of what? A. Of being friendly with these three particular teachers in question." The three named by the appellant were the Misses Ruth Curtis, Mabel Montgomery and Dorothy McGovern. As to appellee's drinking, Mr. Naser testified: "A. She said Jim had been drinking and I said that personally I had never known him to drink. I never ran across him on any particular occasion on which I ever thought that Jim Hewitt was a drinking man or one that ever did drink any. Q. Have you been in his company? A. On many occasions. Q. Over the past thirteen years? A. I would say that I have known Jim Hewitt for the last ten years. We have been fellow Rotarians together for probably the past ten years. We have been comrades in the American Legion for approximately ten years. He has been a member of the Glassport School Board for the last five years, and on many, many occasions we have been together, and never once have I known him to drink. I have always known him to be a very friendly cordial man, as far

as I have been concerned." Appellant did not deny any of Mr. Naser's testimony.

Miss Dorothy McGovern testified that as teacher of the Hewitt child she called at the home in March or April of 1938 and appellant told her that appellee ran around with two teachers and a stenographer; that about a month later (May) Miss McGovern again called upon the appellant because of some gossip she heard connecting her name with appellee and she talked to appellant who assured her "that it was not true, that she hadn't said anything," but Mr. Fabry testified that in July, 1938, he and his wife talked to appellant at the gate to her home, when she accused appellee of "running around with different women" and turning to Mrs. Fabry said, "How would you like to have a thing like that occur, that your husband would be blamed for going around with other women," and then, "Q. Did she name the women? A. Well, she did name one, she named Dorothy McGovern, one of the school teachers." Appellant did not deny the testimony of either Miss McGovern or John Fabry.

The appellant visited Mrs. Metz, a proprietor of a barbecue and restaurant and a tenant of appellee's firm. She informed Mrs. Metz that "she understood he was running around with other women" and "she just said she understood he was supposed to be running around with other women." Appellant did not deny this testimony.

Appellant knew that Miss Anderson, the stenographer, was engaged to be married to a Mr. Dunlop and admitted visiting the parents of this boy "in the interest of my home, to try to keep my home from breaking up." She refused to fix definitely the date of her visit but admitted that it was after she had "found" the note (the note she knew was in Miss Anderson's handwriting) and admitted that she "discussed her husband" in connection with the note with the parents of the boy who was to marry the writer of the note.

Ivan Gressler, a member of the School Board with appellee, testified that appellant called his wife and informed her that her husband (Mr. Gressler) and Mr. Hewitt and other members of the School Board had gone to a cabaret with women and because of these calls, Gressler's wife began to suspect him.

Except as hereinbefore referred to, appellant denied categorically the matters to which appellee testified. She claimed that she and her husband lived happily together until June, 1937, when she found among appellee's effects, some socks which he brought home, a note, Exhibit "A", in form following: "When are you working? Let's get together on something this week. I am getting a wave tomorrow nite—We have to be awful careful. Sat—I have plans for us. Short, but to the point.

"I may go up to your school picnic in the P. M.—but any rate I am just dying to see you." The last paragraph is in handwriting, the rest in typewriting.

The portion of the note in handwriting, according to the subsequent testimony, was in the handwriting of Miss Anderson, the stenographer and secretary in appellee's office. Libellant's secretary prior to the trial of this case became pregnant, but continued to work for libellant's company until a month or two before she was married and had a baby shortly after the marriage. Appellant testified that after appellee took some socks home and "after he had left, I picked up the socks......and among the socks I found this note." She admitted that she knew whose handwriting it was, and that upon his return to the house she told him she had found the note; that he denied the note was for him. She does not testify that she had told him she *knew* who it was from or that she *told* him who it was from, but testified "He tried to convince me that Ruth Curtis had written the note" and admitted that she did not show him the note—just told him about it.

Appellant admitted that the note in question con-

tained a reference to a picnic to be held the next day and admitted attending the picnic and did not see her husband and the suspected girl together and explained that her husband hurried them away from the park in the evening; and admitted seeing a Mr. Fabry with her husband. Appellant also admitted going to the office of appellee in November, 1937, during his absence and going through his desk carefully, to find any correspondence she could, or notes, and found none.

The appellee testified relative to the note: "No, I didn't throw it on the bed. I don't know anything about it. She said she found it in my shirt pocket." He denied that when appellant told him of the note, that he admitted it was for him from the Anderson girl. He denied any discussion between him and appellant to forget the whole incident and denied that he agreed to give up his political activities.

He testified that he attended the school picnic with his child and that appellant joined him there; that he had no appointment there with the Anderson girl; that when appellant joined him at the picnic they "went to Murphy's and had dinner and she had some girls in the evening to play bridge."

Mr. John Fabry testified that he was at the picnic and was with appellee until about five o'clock and until appellant joined them and appellant said, "Come on, we are going to Murphy's and get our dinner......" and thereupon all went to the car and appellant and appellee left.

The finding of this note was the climax of the trouble between the parties and ended in their separation in December of 1937.

Appellant, in addition to her denials, urges very earnestly against the contentions of appellee as to her alleged treatment, the following facts: libellant husband admitted that he made a will in 1932, leaving everything to his wife; admitted he had made all his life insurance policies payable to her, and on October

17, 1936, took an additional life insurance policy on his life and had it made payable to her. He also admitted sending his wife valentines and mother's day cards up to shortly prior to his leaving, with endearing sentiments that he bought, picked out and to which he signed his name. She claims that these matters contradict appellee's testimony as to the alleged unhappy life between them.

As stated in *Koontz v. Koontz,* 97 Pa. Superior Ct. 70, in the opinion by Brother CUNNINGHAM, quoting from the opinion by President Judge PORTER in *Krug v. Krug,* 22 Pa. Superior Ct. 572, "...... 'When witnesses who are competent and equally interested flatly contradict each other, the conclusion of the judge who heard them, as to which is to be believed, is not to be lightly disturbed ...... The contention of the appellant that a divorce ought not to be granted when the testimony of the libellant is not corroborated and is flatly denied by the respondent, is not well founded. The law has made the libellant a competent witness. Whether credible, is a question to be determined by the tribunal which is to pass upon the facts'."

Appellant contends that the testimony as to her alleged actions after the filing of the libel are not competent under the Act of 1933, P. L. 1020, in support of the allegations prior to the filing of the libel. The Act of 1933, supra, Section 25, provides: "The court may allow any libel to be amended so as to include additional grounds or causes for divorce, including such as arose subsequent to the awarding of the subpoena." We cannot agree with appellant's contention. Independent of this Act of Assembly, as stated in *Campbell v. Campbell,* 126 Pa. Superior Ct. 190, 190 A. 536, at p. 195: "The testimony as to respondent's conduct after libellant's withdrawal from the house was relevant solely for the purpose of shedding light upon respondent's behavior prior to the separation. " See also, *Krupp v. Krupp,* 95 Pa. Superior Ct. 474, at p. 481; *Sleight v.*

*Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69, at p. 308; *Hess v. Hess,* 131 Pa. Superior Ct. 601, 200 A. 157.

We do not think that the note, Exhibit "A", explains appellant's actions prior to the filing of the libel, whatever suspicion may have been engendered in her mind thereafter. There was no evidence whatever as to appellee's attentions to women or adulterous inclinations to support appellant's oft-repeated charges. These charges were not established by appellant and if untrue, were in themselves sufficient to warrant a decree on the ground of indignities.

Quoting from the opinion by Brother RHODES, in *Sleight v. Sleight,* supra, at p. 303: "Indignities to the person constitute a separate and distinct ground for divorce, under par. (f) §10, of 'The Divorce Law' of May 2, 1929, P. L. 1237 (23 PS §10 (f)). The principles applicable thereto have often been stated. 'It is, of course, impossible to lay down any general rule as to what constitutes such indignities to the person as to render the condition of the injured spouse intolerable and life burdensome; such matters necessarily depend upon all the circumstances of the particular case and the position in life, character and disposition, of the parties: *Richards v. Richards,* 37 Pa. 225; *Aikens v. Aikens,* 57 Pa. Superior Ct. 424; *Sharp v. Sharp,* 106 Pa. Superior Ct. 33, 161 A. 453. It is well settled, however, that it is not with isolated occurrences that the law concerns itself in determining whether a divorce should be granted upon this ground, but only with indignities, so repeated and continuous as to constitute a course of conduct which renders the complaining party's condition intolerable and life itself a burden: *Esenwein v. Esenwein* (312 Pa. 77, 167 A. 350) ; *Dailey v. Dailey,* 105 Pa. Superior Ct. 461, 161 A. 475; *Sharp v. Sharp,* supra. Such indignities, we have frequently said, "may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest distain, abusive language, malignant

ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient": *Breene v. Breene,* 76 Pa. Superior Ct. 568; *Koontz v. Koontz,* 97 Pa. Superior Ct. 70; *Sharp v. Sharp,* supra': *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 446, 174 A. 821, 822."

We have read the entire record and carefully considered the very able brief on behalf of appellant. In our independent judgment, however, appellee's version of the incidents is sustained by the testimony. We therefore agree with the court below that they amount to indignities rendering his condition intolerable and life burdensome.

The assignment of error is overruled and the decree of the court below is affirmed.