Holman *v.* Holman, Appellant.

Argued May 6, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Wayne Theophilus,* with him *Ralph E. Smith,* for appellant.

*John A. Metz,* with him *David Friedman* and *John A. Metz, Jr.,* for appellee.

OPINION BY RHODES, J., July 18, 1941:

This is an appeal by wife respondent from a decree granting her husband, the libellant, a divorce a vinculo matrimonii.

The libel set forth two grounds: (1) Cruel and barbarous treatment; (2) indignities to the person.

The matter was heard before GARDNER, J., in the court below. A decree was entered granting the divorce on the ground of indignities, from which this appeal was taken.

Respondent presents two reasons which she maintains require a reversal of the decree. They briefly stated are: (1) Libellant failed to meet the burden of proof imposed upon him by the law *(LaClair v. LaClair,* 128 Pa. Superior Ct. 469, 471, 194 A. 224); (2) he was not the injured and innocent spouse (*Taylor v. Taylor,* 142 Pa. Superior Ct. 441, 444, 16 A. 2d 651).

The court below concludes its opinion with these words: "The testimony in this case covers 250 pages. We have briefly related the important points. The testimony of the libellant, with its corroboration by the various witnesses called, leads me to believe that Mrs. Holman was a very nagging woman and was one who 'knew it all' and wouldn't be dictated to. She showed this by her conduct on the stand. After considering the testimony of the various witnesses, as well as that of the libellant and respondent, I am led to the conclusion that the libellant's condition has been intolerable and his life burdensome by the conduct of the respondent; and therefore he is entitled to a divorce."

We also have considered all the evidence, and it is our independent conclusion that respondent's conduct amounts to indignities to the person under paragraph (f), §10, of the Act of May 2, 1929, P. L. 1237, 23 PS §10(f). In our judgment, the evidence discloses a course of conduct on her part which consisted of habitual use of vile and abusive language towards libellant, of incivility and neglect, of ridicule and humiliating charges in the presence of others, of accusations of

drunkenness and infidelity, of continual complaint and dissatisfaction about money matters and with nearly every phase of his conduct, and indicates a settled hate and estrangement on her part.

Such a course of conduct established by clear and satisfactory proof and by a preponderance of the evidence, and not the result of excessive provocation, constitutes indignities to the person and entitles the libellant as the injured and innocent spouse to a divorce. *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 447, 174 A. 821; *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 308, 181 A. 69.

The parties were married on June 17, 1933, and went to reside with libellant's parents at Monaca, Pa. After a few months respondent left, being desirous of living with her mother. The separation continued for about three months. Thereafter they made their residence with a cousin of libellant at Sewickley, Pa., R. D. No. 2. At her insistence they finally moved to her mother's home in Ambridge, Pa., in the latter part of 1934 or the beginning of 1935. Libellant was obliged to leave in April, 1938, and seek lodging elsewhere. On July 6, 1938, he returned after being assured that respondent would change her attitude and conduct. He finally was forced to withdraw from their common domicile on January 6, 1939, having been locked out and told never to return. He did not thereafter cohabit with respondent. At the time of hearing, libellant lived in Sewickley Heights, Pa., and was employed as a garage mechanic, and had been so employed since the spring of 1936.

Libellant's income appears to have been a principal source of trouble. Respondent continually complained that he did not make as much as some other men that she knew, and she said that she should not have married him. As one witness testified, in speaking to libellant she said: "You are a hell of a man; you never will be able to make enough money." She often said she would not live with him unless he made more money.

Although during the early part of their married life libellant's income was uncertain and his employment precarious, he was in no different position than thousands of others during the years 1933, 1934, and 1935. He appears to have been industrious, and in 1936 became a mechanic, which position he has since held. She seems to have received most of his income, and his earnings afforded no excuse for her unreasonable attitude. Even respondent's sister and mother testified that while living with her mother from 1934 to the final separation in January, 1939, they quarreled over money matters "every day." (183 n.t., 193 n.t.) She denied that she called libellant vile and opprobrious names, but there is much testimony besides libellant's that she did, and that this continued more or less as an ordinary occurrence during their entire married life. The language which she would use and the attitude which she would manifest toward libellant were given by various witnesses. Libellant and his witnesses testified to many instances where she ordered him out of the house, and required him to sleep elsewhere. She complained that he was frequently intoxicated, but in the specific instance which she described she was contradicted by a disinterested witness. As indicative of her attitude, one witness testified that she said: "If I want anything at home, I just raise hell until I get it."

In April, 1938, respondent told libellant to get out, and threw his clothes down the stairs. After this occurrence he lived in Sewickley, Pa., until the beginning of July, 1938. At her request he returned, and a few days thereafter respondent accused him of having communicated to her a venereal disease, and informed their friends that he had communicated this disease to her. The final separation occurred on or about January 6, 1939, when libellant was obliged to attend a meeting at the place of his employment. She made various accusations at the time, and told him that if he went he would never come back again.

Common use by her of vulgar and abusive language in speaking to libellant is established by the testimony of several witnesses. She also called him "dumb" in the presence of others, and the assumption of an over-bearing attitude was characteristic of her.

Libellant testified that the effect of her conduct on him was to cause a reduction in his weight from 182 pounds to 138 pounds.

We have not attempted to mention each of the many instances of alleged indignities which appear in the record; some are material and some are trivial. Taken together with her vile and abusive language and mani-festations of hostility, hate, and estrangement, they constitute a course of conduct and are sufficient to estab-lish indignities to the person. *Hess v. Hess,* 131 Pa. Superior Ct. 601, 200 A. 157.

In this case, as in many others of a similar nature, libellant's accusations are categorically denied by re-spondent. One or the other is not telling the truth, as their versions of their marital difficulties in material respects cannot be reconciled. That libellant was sub-jected to unwarranted treatment over money matters, that she habitually throughout their married life called him vile names and epithets, that he frequently was unable to sleep at home and was compelled to go to the garage where he worked, or elsewhere, were facts corroborated by various witnesses. This corroboration and the contradiction by disinterested witnesses of her testimony in some important phases lead us to come to the same conclusion as the court below—that her acts constituted a course of conduct such as to render the condition of libellant intolerable and his life burden-some.

Decree is affirmed.