Brandman *v.* Brandman, Appellant.

Argued October 7, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

reargument refused March 3, 1958.

*Philip M. Hammett,* for appellant.

*Alfred I. Ginsburg,* with him *Bernard L. Lemisch,* for appellee.

OPINION BY WATKINS, J., January 21, 1958:

This is an appeal from a decree of the Court of Common Pleas No. 1 of Philadelphia County, granting Sylvan Brandman, the appellee husband, an absolute divorce from Martha Brandman, the appellant wife, on the ground of indignities.

Both the wife and husband brought actions in divorce and the court below consolidated the cases for a hearing before a master. The result was a report recommending the husband's divorce and the dismissal of the wife's action in divorce a mensa et thoro. Exceptions filed by the appellant were dismissed and a final decree entered August 9, 1955.

The wife appellant then appealed to this Court and on April 9, 1956, before argument on the merits, an order issued vacating the decree of divorce and remitting the record to the court below for the purpose of incorporating into the record certain testimony omitted from the transcript.

The case was remanded to the master, who filed a supplemental report, reaffirming his original recommendation. Exceptions were again dismissed, and on March 18, 1956, a final decree in divorce was entered. This appeal followed.

On July 23, 1957, appellant filed with this Court a petition to vacate the Decree in Divorce and to remand the record to the court below. This petition was dismissed on August 23, 1957.

The parties were married on August 30, 1941. There are no children of the marriage. At the insistence of the appellant this marriage was kept a secret and she continued to use her maiden name. The appellant refused to permit the appellee to establish a common domicile.

In January, 1942, the appellee was inducted into the United States army. He was transferred to Southern Pine, North Carolina, in May of 1943, where he and the appellant lived together as husband and wife until October 1, 1943. The appellee served overseas until April, 1946. After his return they did not live together except for a three-week period in September, 1949. These two periods constituted the total time they lived together as man and wife during this marriage.

The circumstances of this marriage were very unusual. It was an unhappy relationship from the very beginning. The parties carried on a clandestine affair prior to the marriage and the appellant seemed to desire that the relationship be continued in that manner, despite the marriage vows. Both parties were employed, and the appellant refused to use her married name; insisted that the marriage be kept secret, and continued to act as a single woman. She refused to live with her husband as man and wife, seeing him only on occasional nights out. Until the death of her mother she gave no indication of love for her husband or any desire to make a home for him.

After the death of her mother, December 16, 1947, she began to pester the appellee, and although the master believed it was only for the purpose of establishing

grounds for support, or to prevent grounds for divorce accruing, insisted that she wanted, then, to live with him. In September of 1949, the appellant and the appellee lived together for three weeks. She made no attempt to prepare meals; kept an untidy and dirty apartment; refused to go out with the appellee; refused to have intercourse with him; continued to live her own life; ignored the appellee completely; and finally told him she had seen a lawyer and unless he immediately left the apartment she would call the police and have him thrown out.

As a result of the appellant's behavior, appellee became upset, nervous, ill and lost about 30 pounds. He was employed as an order clerk and was unable to work properly because of the annoyances and disturbances she created by visits and telephone calls to his place of employment. His work deteriorated to such an extent that his employer warned him that he would be discharged. Unable to stand the pressure, he finally resigned his position.

" 'It is, of course, impossible to lay down any general rule as to what constitutes such indignities to the person as to render the condition of the injured spouse intolerable and life burdensome; such matters necessarily depend upon all the circumstances of the particular case and the position in life, character and disposition, of the parties' ": *Hewitt v. Hewitt*, 136 Pa. Superior Ct. 266, 7 A. 2d 45 (1939). "The offense is complete when a continued and persistent course of conduct demonstrates that the love and affection upon which the matrimonial status rests has been permanently replaced by hatred and estrangement": *Boyer v. Boyer*, 183 Pa. Superior Ct. 260, at page 271, 130 A. 2d 265 (1957).

An effort is made by the appellant to dispose of her conduct as single acts or isolated incidents. Cer-

tainly a single act or an occasional isolated incident does not entitle a spouse to a divorce on the ground of indignities. The law requires such a course of conduct or continued treatment as renders the appellee's condition intolerable and his life burdensome: *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350 (1953). We believe that the course of conduct set forth in the record of 1600 pages in this case, make up the requirements of the law.

In this case, if we believe the testimony of the appellee, and his witnesses, and disbelieve the testimony presented on behalf of the appellant, as the master did, the charge of indignities is made out. In many instances, the testimony of the appellant and her witnesses, corroborated the testimony of the appellee. We cannot properly disturb the master's conclusions, as to credibility, as the record shows that the appellant testified in an argumentative manner and was very evasive, whereas the appellee and his witnesses testified with candor and definiteness. "The master's report, although advisory only, is to be given the fullest consideration as regards the credibility of witnesses whom he has seen and heard and in this respect his report should not be lightly disregarded". *Boyer v. Boyer,* supra, p. 263.

As Judge KUN puts it, in his opinion: "Soon after the parties were married, defendant insisted, contrary to the wishes of the plaintiff, that the fact of their marriage be kept a secret. Nor would the defendant use her married name. While the plaintiff was in the military service, defendant wrote him letters wherein she stated that she did not love him, and wherein she stated that she received proposals of marriage from other men. She refused to live with the plaintiff for many years, preferring to live with her mother. She continually telephoned him at his place of employment,

causing him great embarrassment and the eventual loss of his job. Similar phone calls were made at all hours of the evening to his home. Defendant avers these calls were made to effect a reconciliation, but there is ample evidence to show that they were made either for harassment or for the purpose of having her husband 'date' her. One incident is particularly revealing and supports this conclusion. Several years ago the parties attempted to live together as man and wife. Testimony was given to show that the only reason defendant did this was because she received legal advice that such cohabitation would preclude her husband from divorcing her in the future. During this period she never prepared meals or had intercourse with, or paid any attention to, the plaintiff. She came and left their apartment as if he did not exist.

"Defendant would create scenes in the street—such as climbing upon plaintiff's automobile—which caused the plaintiff much embarrassment. On several occasions she falsely accused him of infidelity, which, when accompanied by other degrading conduct, is in itself sufficient to make out a case of indignities. Miln v. Miln, 175 Pa. Superior Ct. 613. Finally, she telephoned and approached friends, relatives, employers and fellow employees of the plaintiff and volunteered false personal information to them concerning her husband and herself, such as stating that she was pregnant".

The accusations of infidelity, and the hiring of a detective to follow the appellee and report his actions to her, based on what was decided to be unfounded suspicions, certainly amounted to an indignity, which, together with the other circumstances contained in the record, would sustain this decree." 'Accusations of misconduct and infidelity made without foundation and persisted in so as to become a course of conduct, constitute a species of indignities and, when they are ac-

companied by other insulting and humiliating conduct, are sufficient to warrant a decree of divorce' ". *Wittmer v. Wittmer,* 151 Pa. Superior Ct. 362, 30 A. 2d 174 (1943).

The appellee herein denied unfaithfulness; contends that he tried to be a good husband and she made it impossible for the marriage to continue. It is our opinion that the appellee met the burden of establishing, by a preponderance of the evidence, that his wife offered such indignities to the person as to render his condition intolerable and life burdensome; that he is the innocent and injured spouse and that he is entitled to a divorce.

Decree affirmed.